# EXHIBIT "D"

IN THE CHANCERY COURT OF
DAVIDSON COUNTY, TENNESSEE

FIRST ACCEPTANCE CORPORATION,       )
                                     )
    Plaintiff,                        )
                                     )
vs.                                  )   Docket No. 12-0348 -IV
                                     )
                                     )
CATLIN INSURANCE COMPANY (UK),       )
LTD.,                                )
                                     )
    Defendant.                        )

---

## COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES

     Comes now the Plaintiff, First Acceptance Corporation ("FAC"), by and through counsel,

and brings this action for declaratory judgment pursuant to the provisions of Tennessee Code

Annotated § 29-14-101, et seq. ("Tennessee's Declaratory Judgment Act"), breach of contract,

and bad-faith against Catlin Insurance Company (UK), Ltd., ("Catlin"). FAC seeks a declaration

of the parties' respective rights and obligations under the insurance policy in connection with a

claim first made against FAC and reported to Catlin in writing during the policy period.

### PARTIES

    1.    FAC is a Delaware corporation with offices located at 3813 Green Hills Village

Drive in Nashville, Tennessee 37215 and is properly licensed and qualified to do business within

the State of Tennessee. Plaintiff is a proper party to this action pursuant to Tennessee Code

Annotated § 29-14-107.

    2.    Catlin is a foreign corporation with offices at 140 Broadway, 43rd Floor, New

York, New York, 10005, that is an eligible surplus lines insurer in Tennessee, transacts business

743321.1

in Tennessee, and has contracted to supply services in Tennessee, including the sale of professional liability insurance policies covering risks in Tennessee. Pursuant to Tennessee Code Annotated § 56-2-601, *et seq.*, Catlin may be served with process through the Tennessee Commissioner of Insurance at 500 James Robertson Parkway, Davy Crockett Tower, Nashville, Tennessee, 37243-0565.

3.    Pursuant to its internal regulations, the database of the Tennessee Department of Commerce and Insurance designates Gardere, Wynne, Sewell, LLP, 600 Congress Avenue, Suite 3000, Austin, Texas 78701 as Catlin's agent to which process should be issued and served.

## VENUE AND JURISDICTION

4.    Catlin is an eligible insurer in Tennessee, insures risks in Tennessee, transacts business in Tennessee, and contracts to supply services in Tennessee, including the sale of professional liability insurance policies covering risks in Tennessee.

5.    FAC, the owner of a policy issued by Catlin, has its principal place of business in Davidson County, Tennessee.

6.    During all times relevant to this Complaint, FAC has tracked, monitored and/or coordinated the defense and/or settlement of insurance claims and rendered professional services to its policyholders from Davidson County, Tennessee.

7.    Likewise, during all times relevant to this Complaint, FAC has sent to and received from Catlin claims correspondence related to this particular claim and otherwise communicated with Catlin from Davidson County, Tennessee.

8.    This Court has jurisdiction pursuant to Tennessee Code Annotated §29-14-102; and venue is proper in this Court pursuant to Tennessee Code Annotated §20-4-104(3)(B).

9.    Venue and jurisdiction, therefore, are proper in Davidson County, Tennessee.

2

# THE POLICY

10.  Catlin issued and/or sold the following professional liability insurance policy to FAC ("the Policy"):

| CATLIN | |
|---|---|
| **POLICY PERIOD** | **POLICY NUMBER** |
| 07-01-2010 TO 07-01-2011 | ICP-91968-0710 |

11.  A copy of the Policy is attached as Exhibit A.

12.  Pursuant to the provisions of the Insuring Agreement, Catlin agreed as follows:

I. Insuring Agreement

> The Insurer shall pay, on behalf of the Insured, Loss arising from any Claim by a policyholder or third party client first made against the Insured during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer during such period pursuant to the terms of this Policy for a Wrongful Act in the rendering of or failure to render Professional Services to the claimant.

13.  Section II of the Policy defines "Loss" as:

> Loss" means damages, judgments, settlements and Defense Costs. Loss shall include punitive, exemplary, and multiple damages to the fullest extent permitted by applicable law. Where the Insureds reasonably determine that punitive, exemplary or multiple damages are insurable under applicable law, the Insurer will not contest this determination.

14.  Section II of the Policy defines "Professional Services" as:

> "Professional Services" means the services performed by an Insured for a policyholder or third party client pursuant to a written contract with such policyholder or third party client for a fee, commission or other remuneration or financial consideration which inures to the benefit of the Company.

3

15. Section II of the Policy defines "Wrongful Act" as:

> "Wrongful Act" means any breach of duty, neglect, error, misstatement or misleading statement, omission or act by an Insured.

16. The following provisions are relevant to when coverage is triggered under the Policy:

> (a) Section II of the Policy defines "Claim" as:
>
> > 1. a written demand for monetary or non-monetary relief made upon an Insured;
> >
> > 2. a civil or criminal proceeding (including an arbitration or mediation proceeding) for monetary or non-monetary relief against an Insured which is commenced by service of a complaint or similar pleading or return of an indictment or information in the case of a criminal proceeding;
> >
> > 3. any administrative or regulatory proceeding for monetary or non-monetary relief against an Insured which is commenced by receipt of a notice of charges; or
> >
> > 4. a civil, criminal, administrative or regulatory investigation of an Insured for a Wrongful Act, but only after such Insured is identified in writing by the investigating authority as an entity or person against whom a proceeding described in 2. above may be commenced.

17. Pursuant to the terms and provisions of the Policy, any claim alleging bad faith in claims handling and adjusting constitutes a wrongful act for which coverage is extended under the Policy.

4

18.     Section VI of the Policy entitled "Notice of Claim or Wrongful Act" specifies that an Insured may provide Catlin with a notice of circumstances which reasonably may be expected to give rise to a "Claim":

> If during the Policy Period, the Insureds become aware of a specific Wrongful Act which reasonably may be expected to give rise to a Claim being made against the Insureds and give written notice to the Insurer of the specific Wrongful Act, the reasons for anticipating such a Claim, the identities of the potential claimants and the Insureds allegedly responsible for such specific Wrongful Act, the amount of actual or potential damages, and the circumstances by which the Insureds first became aware of such specific Wrongful Act, then any Claim subsequently made against the Insureds arising out of such specific Wrongful Act, shall be deemed to have been made at the time such notice was received by the Insurer.

## BACKGROUND

19.     On August 12, 2007 a motor vehicle accident involving an FAC insured driver, Josh Minson, resulted in personal injuries to various individuals including Justin Pittman, Chelsea Pittman, and Wendy Pittman (collectively "the Pittmans") for which each made claims against Mr. Minson's FAC policy.

20.     As a result of the various claims presented in connection with the motor vehicle accident that occurred on August 12, 2007, FAC initiated efforts to enter into a global settlement to resolve all claims for the policy limits available to Mr. Minson. Despite the efforts initiated by FAC, the Pittmans elected not to participate in the mediation process designed to resolve all claims. On or about February 22, 2008, the Pittmans filed a complaint for damages in the Circuit Court of the Third Judicial Circuit in and for Columbia County, Florida being Case No. 08-108CA.

5

21. FAC, pursuant to the liability policy issued to its insured, Mr. Minson, defended the claim and continued its efforts to resolve the outstanding claim for the remaining limits of the Minsons' policy.

22. On May 6, 2011, the Pittmans' counsel provided Mr. Minson (not FAC) with a written settlement demand in the amount of $21,500,000. A copy of the Pittmans' settlement demand letter is attached as Exhibit B.

23. As a result of the Pittmans' written settlement demand, on May 27, 2011, FAC instructed Lockton Insurance Brokers, LLC ("Lockton") to provide Catlin with notice of circumstances pursuant to Section VI of the Policy. Because of the amount demanded, FAC explained that it reasonably expected the Pittmans to bring bad faith and/or negligent claims handling against FAC. A copy of the Lockton letter is attached as Exhibit C.

24. On June 7, 2011, Lockton informed Catlin of FAC's notice of circumstances regarding the Pittman matter. A copy of this letter is attached as Exhibit D.

25. Catlin acknowledged receipt of FAC's notice of circumstances regarding the Pittman matter on June 20, 2011. A copy of this acknowledgement is attached as Exhibit E.

26. Upon the receipt of FAC's notice of circumstances, Catlin's Senior Claims Examiner, Inna Kogan, attempted to limit coverage under the Policy by maintaining that all notices of circumstances were *required to be reported to Catlin* under the terms of the Policy.

27. On July 27, 2011, Ms. Kogan withdrew her previous position and explained to FAC that, as of that date, Catlin would agree to accept the Pittman matter as a notice of circumstances. The July 27, 2011 e-mail is attached as Exhibit F. By treating the Pittmans' written settlement demand as a notice of circumstances rather than as a "Claim," Catlin indicated to FAC that it did not consider Exhibit B issued on May 6, 2011 as sufficient to trigger a "Claim"

6

under the Policy. Catlin confirmed this position in a September 1, 2011 letter to FAC, which is attached as Exhibit G.

28. Due to the impending mediation and trial date of the Pittman matter, on September 13, 2011, FAC wrote Ms. Kogan and requested that Catlin become directly involved in further settlement negotiations, and "to confirm Catlin's coverage position with respect to this matter . . . ." A copy of the letter is attached as Exhibit H.

29. On October 31, 2011, Catlin's counsel, Jessica Tyndall, informed FAC that "Catlin has determined that the matter should be treated as a Claim going forward" and requested a substantial amount of information from FAC. A copy of the e-mail correspondence is attached as Exhibit I.

30. Catlin confirmed this position in an October 31, 2011 letter to FAC,[1] Ms. Tyndall stated that although a "Claim" is defined by the Policy as a "written demand for monetary relief," based on the circumstances surrounding the Pittmans' lawsuit against FAC, the demand at a recent mediation and the Pittmans' continued allegations that FAC erred in its claims handling, Catlin had concluded that it was now appropriate to treat the matter as a "Claim." A copy of the letter is attached as Exhibit J.

31. FAC complied with all of Ms. Tyndall's requests by providing Catlin with its claim file and other related documents regarding the Claim.

32. While FAC involved Catlin in all settlement discussions regarding the Pittmans' Claim, Catlin failed to provide FAC with authorization to offer its $1 million self-insured retention until January 11, 2012. Catlin further refused to commit to participate in any mediation.

---

[1] The letter is improperly dated October 31, 2010. The letter should reflect the date of October 31, 2011.

7

33.     On January 17, 2012, Ms. Tyndall informed FAC that Catlin was denying all coverage regarding the Claim notwithstanding its previous correspondence with FAC. A copy of this letter is attached as Exhibit K.

34.     Catlin contended that its denial was based on the January 29, 2008 and January 30, 2008 letters from the Pittmans' counsel, Alejandro M. Garcia. Mr. Garcia's letters, Catlin maintained, constituted a previous "written demand for monetary relief," and therefore should have been reported under an earlier policy period. Catlin concluded that the Pittman claim failed to trigger coverage during the 2010-2011 Policy period due to the "claims made and reported" language of the Policy. Copies of Mr. Garcia's letters are collectively attached as Exhibit L.

35.     FAC responded on January 23, 2012, that Catlin's sudden denial of coverage was unwarranted because Mr. Garcia's January 29, 2008 letter merely indicated that the Pittmans would be looking for an excess verdict against Mr. Minson and failed to demand any monetary relief from FAC. A copy of the letter is attached as Exhibit M.

36.     On January 27, 2012, Ms. Tyndall responded that Catlin's coverage position "was sound and supported by the facts and applicable law." Catlin advised FAC that it reserved its rights to contest the reasonableness of any settlement in an amount exceeding $3 million. This correspondence again provided FAC with no basis for Catlin's coverage position consistent with the terms and conditions of the Policy. A copy of the letter is attached as Exhibit N. Subsequently, Catlin retracted its position, waived any objections to the resolution of the Pittmans' claim for an amount less than three million ($3,000,000.00) dollars and agreed not to dispute the reasonableness of the settlement.

37.     On February 7, 2012, FAC informed Catlin that its denial of coverage was baseless, and that by continuing to maintain such position, Catlin was acting in bad faith.

8

743321.1

Eventually, the claim was resolved for $2.1 million and FAC demanded that Catlin tender $1.1 million under the terms of the Policy. A copy of this letter is attached as <u>Exhibit O</u>.

38. FAC has provided notice and otherwise complied with all terms and conditions precedent to coverage with respect to Catlin's coverage.

39. Nevertheless, Catlin has denied coverage of the claim despite its representations to FAC that it intended to treat the matter as a "Claim." Rather, Catlin has denied FAC coverage notwithstanding the terms and conditions of the Policy and contrary to position previously adopted.

40. FAC has engaged in repeated, good faith efforts to reach an agreement with Catlin consistent with Tennessee law but Catlin has refused to provide coverage in accordance with its obligations.

## COUNT I: DECLARATORY RELIEF

41. FAC incorporates by reference the foregoing paragraphs as if fully set forth herein.

42. Under the terms of the Policy, Catlin has a duty to FAC to provide coverage for the Claim.

43. Despite demand and contrary to the position previously adopted, Catlin breached and/or disputed their obligations under the Policy.

44. As a direct and proximate result of Catlin's breaches, FAC has incurred substantial actual costs and damages, and such damages are continuing.

45. An actual controversy of a justiciable nature presently exists between FAC and Catlin regarding the scope of coverage under the Policy and/or the appropriate trigger and allocation applicable to the Claim, as to which declaratory relief is proper considering the

9

provisions of the Policy and underlying facts and circumstances. FAC is entitled to a declaration that there is coverage under the Catlin Policy for the subject claim and loss incurred by FAC.

## COUNT II- BREACH OF CONTRACT

46.    FAC incorporates by reference the foregoing paragraphs as if fully set forth herein.

47.    Under the terms and conditions of the Policy sold to FAC, FAC is entitled to the payment of benefits as set forth within FAC's Claim presented to Catlin.

48.    FAC presented a "Claim" under the Policy and has otherwise provided Catlin all the information necessary to establish its entitlement to the payment of benefits.

49.    Notwithstanding the presentation of the Claim, Catlin refuses to make payments to FAC as required under the terms of the Policy.

50.    The contract of insurance entered into between FAC and Catlin imposed upon Catlin and its agents and/or representatives the obligation to deal fairly, reasonably and in good faith with FAC. Catlin has violated these duties and, as a result thereof, FAC has sustained damages.

51.    Catlin's refusal to pay FAC the amounts paid in excess of the retained limit constitutes a breach of contract for which FAC is entitled to recover all damages suffered as a result thereof.

## COUNT III – BAD-FAITH PENALTY

52.    FAC incorporates by reference the foregoing paragraphs as if fully set forth herein.

53.    Catlin's refusal to make payments to FAC as described herein constitutes a bad-faith denial of FAC's claim.

10

54.    As a result of Catlin's bad-faith refusal, FAC has incurred additional expense, loss and injury thereby justifying imposition of a twenty-five percent (25%) bad-faith penalty as provided by Tenn. Code. Ann. §56-7-105.

WHEREFORE, Plaintiff prays as follows:

A.    That service of process is issued to Defendant according to law and Defendant be required to appear and answer truthfully to the allegations contained in this Complaint;

B.    That the Court, pursuant to Tennessee Code Annotated § 29-14-101 et seq., adjudge, determine and declare that FAC is entitled to coverage and damages under the Policy consistent with Tennessee law;

C.    That the Court award FAC compensatory and consequential damages in an amount to be determined by the enlightened conscience of the jury and as demonstrated by the evidence, including pre- and post-judgment interest;

D.    That the Court award a bad-faith penalty as provided by Tenn. Code Ann. §56-7-105; and

E.    For such further and additional relief to which the Court may determine Plaintiff is entitled.

11

Respectfully submitted this __5__ day of __March__ , 2012.

WOOLF, McCLANE, BRIGHT,
ALLEN & CARPENTER, PLLC

By: _____
Luis C. Bustamante, BPR # 015328
Katherine F. Layman, BPR #029165

Post Office Box 900
Knoxville, Tennessee 37901-0900
(865) 215-1000

Attorneys for Plaintiff First Acceptance Corporation

12

## COST BOND

We acknowledge ourselves as surety for all costs and taxes in this case in accordance with Tenn. Code Ann. § 20-12-120.

PRINCIPAL:

By: _Mark D. Reineke_
     MARK D. REINEKE

FIRST ACCEPTANCE CORPORATION

SURETY:

WOOLF, McCLANE, BRIGHT,
   ALLEN & CARPENTER, PLLC

By: _____
     Luis C. Bustamante, BPR # 015328
     Katherine F. Layman, BPR #029165

Post Office Box 900
Knoxville, Tennessee 37901-0900
(865) 215-1000

13

743321.1

# EXHIBIT A

## PROFESSIONAL LIABILITY INSURANCE POLICY

### [attached]

743321.1

INSURANCE COMPANY
PROFESSIONAL LIABILITY
INSURANCE POLICY DECLARATIONS

FILED CATLIN

2012 MAR -7 PM 12: 28

| Policy No.: ICP-91968-0710 | Renewal of Policy No.: ICP-91968-0709 |
| | DAVIDSON CO. CIRCUIT CT. |

THIS IS A "CLAIMS MADE AND REPORTED" POLICY. SUBJECT TO ITS TERMS AND PROVISIONS, THIS POLICY ONLY AFFORDS COVERAGE FOR CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER IN WRITING DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE. IN ADDITION, DEFENSE COSTS ARE INCLUDED IN AND WILL REDUCE THE LIMITS OF LIABILITY.

PLEASE READ THIS ENTIRE POLICY CAREFULLY. CONSULT YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS OF THIS POLICY.

| INSURER | CORRESPONDENCE OFFICE | PRODUCER |
|---|---|---|
| Catlin Insurance Company (UK) Ltd. 6th Floor 3 Minster Court London, UK EC3R7 | Catlin, Inc. 140 Broadway, 43rd Floor New York, NY 10005 | Lockton Companies International The St Botolph Bldg.,138 Houndsditch London, EC3A 7AG |

Terms appearing in bold are defined in the Policy.

Item 1. **Named Insured:** First Acceptance Corporation
Principal Address: 3322 West End Ave, Suite 1000
Nashville, TN 37203

Item 2. **Policy Period:**
From: 07/01/2010    at 12:01 a.m. (local time at the address stated in Item 1.)
To:    07/01/2011    at 12:01 a.m. (local time at the address stated in Item 1.)

Item 3. **Aggregate Limit of Liability:** $ 5,000,000

Item 4. **Retention:** $ 1,000,000

Item 5. **Coinsurance Percentage each Claim:**    0 %

Item 6. **Premium:**    $ 180,000.00
Additional Premium for the Discovery Period:    150% of Premium
Length of the Discovery Period: 12 Months

Item 7. **Pending or Prior Date:** 06/01/1998

Item 8. **Retroactive Date:** N/A

Item 9. **Notices to Insurer:**

Claims:

Claim Manager – Professional Liability
Catlin, Inc.
140 Broadway, 43rd Floor
New York, NY 10005
E-mail: catlinclaimspl@catlin.com

All Other Notices:

Underwriting Manager – Professional Liability
Catlin, Inc.
140 Broadway, 43rd Floor
New York, NY 10005

Case 3:12-cv-00484 Document 1-4 Filed 05/16/12 Page 16 of 104 PageID #: 40

Item 10. Endorsements Applicable to Coverage at Inception of Policy:
        See Schedule of Endorsements

**THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION FOR THIS POLICY, ALL MATERIALS SUBMITTED THEREWITH OR MADE A PART THEREOF AND THE POLICY FORM ATTACHED HERETO, CONSTITUTE THE POLICY.**

This Policy shall not be valid unless also signed by another duly authorized representative of the Insurer.

| Countersigned: | By: |
|---|---|
| Date:    10/18/2011 | Authorized Representative: John Van Decker |

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 17 of 104 PageID #: 41

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SCHEDULE OF FORMS AND ENDORSEMENTS

| Named Insured | | | |
|---|---|---|---|
| First Acceptance Corporation | | | |
| **Policy Number** | **Policy Period** | | |
| ICP-91968-0710 | From 07/01/2010 | To | 07/01/2011 |

| Forms and Endorsements | |
|---|---|
| PLMP601 0408 | Nuclear Energy Exclusion |
| PLIC001 0408 | Insurance Company Professional Liability Insurance Policy Declarations |
| ABAP401 0807 | In Witness Endorsement |
| ABAP900 1008 | Service of Suit |
| PLIC051 0408 | Insurance Company Professional Liability Insurance Policy (B) |
| PLIC400 0709 | Credit Rating Trigger Cancellation Endorsement |
| PLIC401 0709 | Amended Definition Of Application Endorsement |
| PLIC403 0709 | Amended Definition Of Insureds Endorsement |
| PLIC404 0709 | Amended Dishonesty/Personal Profit Exclusion Endorsement |
| PLIC405 1109 | Amended Mergers And Acquisitions Threshold Endorsement |
| PLICM003 1208 | Amended Notice Of Claim Or Wrongful Act Endt |
| PLICM053 0710 | Amended Representations Endorsement |
| PLICM052 0710 | Amended Definition Of Claim Endorsement |
| PLICM054 0710 | Amended Severability Provision Endorsement |
| PLICM002 0709 | Amended Subrogation Endorsement |
| PLICM051 0710 | Amended Coinsurance Endorsement |
| PLIC406 0709 | Deletion of Exclusion Endorsement |

ABAP 302 1007

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 18 of 104 PageID #: 42

# INSURANCE COMPANY
# PROFESSIONAL LIABILITY
# INSURANCE POLICY



> THIS IS A "CLAIMS MADE AND REPORTED" POLICY. SUBJECT TO ITS TERMS AND PROVISIONS, THIS POLICY ONLY AFFORDS COVERAGE FOR CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER IN WRITING DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE. IN ADDITION, DEFENSE COSTS ARE INCLUDED IN AND WILL REDUCE THE LIMITS OF LIABILITY.
>
> PLEASE READ THIS ENTIRE POLICY CAREFULLY. CONSULT YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS OF THIS POLICY.

In consideration of the payment of the premium, and in reliance upon the statements made in the Application, which is incorporated into this Policy and forms a part hereof, the Insurer identified on the Declarations, herein called the "**Insurer**", agrees as follows:

I.    **Insuring Agreement**

The Insurer shall pay, on behalf of the Insured, Loss arising from any Claim by a policyholder or third party client first made against the Insured during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer during such period pursuant to the terms of this Policy for a Wrongful Act in the rendering of or failure to render Professional Services to the claimant.

II.    **Definitions**

A.    "**Application**" means:

1.    the application for this Policy and for any policy of which this Policy is a direct or indirect renewal or replacement, any attachment to any such application(s), any other materials submitted with or incorporated into any such application(s) and any documents submitted in connection with the underwriting of any such policy (ies); and,

2.    to the extent made by or required of the Insureds:

any public documents filed prior to the inception date of this Policy by the Named Insured with the Securities and Exchange Commission or any similar federal, state, local or foreign regulatory body, and any other written public statement or certification required by law to be made by the chief executive officer, chief financial officer or other executive officer of the Named Insured regarding the accuracy, completeness or adequacy of such Insured's financial statements, SEC filings, or internal controls;

whether or not such public documents, statements or certifications are furnished to the Insurer.

The Insureds agree that all warranties and representations contained in the Application are deemed made to the Insurer. The Insureds agree further that the Application is deemed attached to and incorporated into this Policy.

B.    "**Claim**" means:

1.    a written demand for monetary or non-monetary relief made upon an Insured;

2.    a civil or criminal proceeding for monetary or non-monetary relief against an Insured which is commenced by service of a complaint or similar pleading or return of an indictment or information in the case of a criminal proceeding; or

PLIC 051 0408

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 19 of 104 PageID #: 43

3.   any administrative or regulatory proceeding for monetary or non-monetary relief against an **Insured** which is commenced by receipt of a notice of charges.

**Claim** shall not include an investigation.

C.   "**Company**" means the **Named Insured** and any **Subsidiary** created or acquired on or before the inception date and time stated in Item 2. of the Declarations or, subject to General Conditions 9.D., during the **Policy Period**, including any such company as a debtor in possession under United States bankruptcy law or an equivalent status under foreign law.

D.   "**Company Takeover**" means:

1.   the **Named Insured** consolidating with or merging into, or selling all or substantially all of its assets to any other person or entity or group of persons and/or entities acting in concert, or
2.   any person or entity or group of persons and/or entities acting in concert that acquire an amount of the outstanding securities representing more than fifty percent (50%) of the outstanding stock or other interest representing the present right to vote, designate or select a majority of the board of directors of the **Named Insured**.

E.   "**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against the **Insureds**, but excluding the **Company's** overhead expenses or any salaries, wages, fees or benefits of any directors, officers or employees of the **Company**.

F.   "**Insureds**" means
1.   the **Company**; and
2.   any natural person who was, now is or shall be a duly elected or appointed director, officer or employee of the **Company** solely while acting in his or her capacity as such.

G.   "**Interrelated Wrongful Acts**" means any **Wrongful Acts** that are:

1.   similar, repeated or continuous; or
2.   connected by reason of any common facts, circumstance, situation, transaction, casualty, event, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies.

H.   "**Loss**" means damages, judgments, settlements and **Defense Costs**. **Loss** shall include punitive, exemplary, and multiple damages to the fullest extent permitted by applicable law. Where the **Insureds** reasonably determine that punitive, exemplary or multiple damages are insurable under applicable law, the **Insurer** will not contest this determination.

**Loss** shall not include:

1.   civil or criminal fines or penalties imposed by law;
2.   taxes;
3.   the cost of any non-monetary relief, including without limitation any costs associated with complying with any injunctive relief of any kind or nature imposed by any judgment or settlement;
4.   any amount for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**; or

5. any matter which may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

I. "Named Insured" means the entity identified in Item 1. of the Declarations.

J. "Policy Period" means the period of time from the inception date and time stated in Item 2. of the Declarations to the earlier of the expiration date and time stated in Item 2. of the Declarations or the effective date and time of the cancellation of this Policy.

K. "Pollutants" means:

1. any substance that exhibits any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or any foreign, state, county, municipal or local counterpart thereto, including, but not limited to, solids, liquids, gaseous or thermal irritants, contaminants or smoke, vapor, dust, soot, fumes, acids, alkalis, chemicals or waste materials (including but not limited to materials to be recycled, reconditioned or reclaimed sewage or waste water, nuclear materials, infectious or medical waste); or

2. any air emission, magnetic or electric waves or emissions, odor, oil or oil products, asbestos or asbestos products, fibers, mold, spores, fungi, germs, bacteria, viruses or any noise.

L. "Professional Services" means the services performed by an Insured for a policyholder or third party client pursuant to a written contract with such policyholder or third party client for a fee, commission or other remuneration or financial consideration which inures to the benefit of the Company;

M. "Subsidiary" means any corporation or limited liability company during any time in which the Named Insured owns, directly or indirectly through one or more of its Subsidiaries, more than fifty percent (50%) of the outstanding stock or other interest representing the present right to vote, designate or select a majority of the board of directors of a corporation or the management board of a limited liability company.

N. "Wrongful Act" means any breach of duty, neglect, error, misstatement, or misleading statement, omission or act by an Insured.

III. **Exclusions**

This Policy provides no coverage in connection with any Loss arising from any Claim:

A. brought about or contributed to by the gaining in fact of any profit or advantage to which an Insured was not legally entitled or the committing in fact of any criminal act;

B. brought about or contributed to by the committing in fact of any deliberately fraudulent act or deliberate conflict of interest;

provided that for the purpose of determining the applicability of Exclusions A. and B., the Wrongful Act of any natural person who was, now is or shall be a duly elected or appointed director, officer or employee of the Company shall not be imputed to any other director, officer or employee, but such Wrongful Act shall be imputed to the Company;

C. for any actual or alleged bodily injury, mental anguish or emotional distress, sickness, disease, death of any person, libel, slander, defamation or disparagement, violation of any person's right of privacy, false arrest, detention, imprisonment, wrongful entry or eviction, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, this exclusion shall not apply to any Claim alleging bad faith in claims handling and adjusting;

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 21 of 104 PageID #: 45

D.    arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, or amendments thereto or regulations thereunder, or any similar foreign, state, local or common law in connection with any employee pension benefit plan, employee welfare benefit plan or excess benefit plan as defined in 29 U.S.C. § 1002, or employee stock ownership plan as defined in 26 U.S.C. § 4975, of the Company;

E.    by, on behalf of or in the right of the Insureds, in any respect and whether or not collusive, or a receiver, liquidator, rehabilitator, trustee in bankruptcy or successor to the rights of any Insured under this Policy; provided, however, this exclusion does not apply to a Claim by an employee of the Company in his or her capacity as a policyholder or third party client of the Company;

F.    arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

      1.   any demand, suit, proceeding or other claim made against the Insured, or any investigation of which any Insured had notice, pending on or prior to the Pending or Prior Date stated in Item 7. of the Declarations; or
      2.   any fact, matter, circumstance, situation, transaction or event underlying or alleged in such demand, suit, proceeding, claim or investigation;

      regardless of the legal theory upon which such Claim is predicated;

G.    arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

      1.   any Wrongful Act occurring on or prior to the Retroactive Date set forth in Item 8. of the Declarations; or
      2.   any Wrongful Act occurring after such Retroactive Date which, together with a Wrongful Act occurring on or prior to such Retroactive Date, would constitute Interrelated Wrongful Acts; or

H.    arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

      1.   any Wrongful Act alleged in any demand, suit, proceeding or other claim which has been reported, or in any circumstance of which notice has been given, prior to the Policy Period under any other insurance policy; or
      2.   any other Wrongful Act whenever occurring, which together with a Wrongful Act which has been the subject of such claim or notice, would constitute Interrelated Wrongful Acts.

I.    arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

      1.   any Wrongful Act or any fact, matter, circumstance, situation, transaction or event involving the Insureds that resulted in a judgment or settlement against a policyholder of the Insureds for an amount in excess of the limit of liability under the policy issued to such policyholder which judgment or settlement occurred prior to the Pending or Prior Date stated in Item 7. of the Declarations; or
      2.   any other Wrongful Act whenever occurring, which together with the Wrongful Act described in 1. above, would constitute Interrelated Wrongful Acts;

      provided, however, this exclusion shall only apply to a Claim for a Wrongful Act involving claims handling and adjusting;

PLIC 051 0408

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 22 of 104 PageID #: 46

J.	arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving:

1.	the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or

2.	any direction to test for, treat, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**;

including without limitation any actual or alleged property damage or financial loss incurred by, or bodily injury, sickness or disease or death of, any **Insured** or any policyholder or client or other person or organization resulting from the matters described in (a) or (b) of the exclusion; or the handling or adjusting of claims by the **Insureds** for a policyholder or third party client involving the aforementioned matters;

K.	for premiums, return premiums, tax monies, fees, commissions, other compensation, or interest thereon; or that portion of any settlement or award in an amount equal to such premiums, return premiums, tax monies, fees, commissions, other compensation, or interest thereon, or arising out of any commingling of funds;

L.	arising out of, based upon or in consequence of, directly or indirectly resulting from, or in any way involving actuarial consulting or the failure to establish, the inadequacy or the inaccuracy of reserves;

M.	by, or on behalf of, or in the right of any reinsurer of the **Company**; provided, however, this exclusion shall not apply to a **Claim** by a reinsurer in its capacity as a policyholder or third party client of the **Company**;

N.	arising out of, based upon or in consequence of, directly or indirectly resulting from, or in any way involving the insolvency, conservatorship, receivership, bankruptcy, liquidation or inability of the **Insureds** to pay claims or perform **Professional Services**;

O.	arising out of, based upon or in consequence of, directly or indirectly resulting from, or in any way involving any express warranties or guaranties, estimates of probable construction costs, or costs exceeding estimates made in connection with **Professional Services**;

P.	arising out of, based upon or in consequence of, directly or indirectly resulting from, or in any way involving any **Claim** by, or on behalf of, or for the benefit of, or with the solicitation or assistance of:

1.	any pool, association or syndicate (including any officer, director or employee thereof) in which the **Insureds** are a participant; or

2.	any participant (including any officer, director or employee thereof) in any pool, association or syndicate in which the **Insureds** are a participant;

Q.	for any liability contractually assumed by the **Insureds** under any:

1.	policy, contract or agreement of insurance, reinsurance, suretyship, annuity or endowment; or

2.	other oral, written or implied contract or agreement, except liability which arises from the negligent performance of **Professional Services**, or to the extent that liability would have attached to the **Insureds** in the absence of such contract or agreement;

R.	for any of the following services:

1.	medical, dental or related healthcare;
2.	real estate appraisal;
3.	architectural or construction management; or
4.	the practice of law or the rendering of legal;

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 23 of 104 PageID #: 47

S.     arising out of, based upon or in consequence of, directly or indirectly resulting from, or in any way involving discrimination;

T.     arising out of, based upon or in consequence of, directly or indirectly resulting from, or in any way involving any Insured's service as a director, officer or employee of any entity other than the Company, even if directed or requested by the Company to serve as a director, officer, or employee of such other entity;

U.     arising out of, based upon or in consequence of, directly or indirectly resulting from, or in any way involving the unauthorized access to any electronic data processing or computer systems of the Insured;

V.     arising out of, based upon or in consequence of, directly or indirectly resulting from, or in any way involving advertising activities or material, or the marketing or selling of any insurance policy or annuity, or any other insurance or investment product; provided, however, this exclusion shall not apply to a Claim arising solely out of a representation, promise or guarantee of a Contract Agent acting without the authority or approval of the Insureds (for purposes of this exclusion, Contract Agent means a duly licensed life or accident and health agent, general or managing agent, or duly licensed registered representative or registered principal with the National Association of Securities Dealers, Inc., while acting under valid contract with the Insureds);

W.     arising out of, based upon or in consequence of, directly or indirectly resulting from, or in any way involving:

    1.     any actual or alleged purchase, sale, origination, participation, syndication, grant, commitment, restructuring, termination, transfer, repossession or foreclosure of any loan, lease or extension of credit, or the failure to do any of the foregoing, or the rendering of advice in connection with any loan, lease or extension of credit;

    2.     acting as a real estate broker or agent, escrow agent, property manager or title agent;

    3.     forming, syndicating, selling, operating, administering, advising, or rolling up a limited partnership, or limited liability company or similar entity, or real estate investment trust;

    4.     the selling of any securities that were neither registered nor approved for sale by the Company ("selling away");

    5.     the Insureds' actual or alleged oral or written representation, promise or guarantee of the past performance or future value of any insurance or investment product; or

    6.     performing services in connection with any aspect of mergers, acquisitions, securities underwritings, restructurings, divestitures or investment banking.

## IV.    Limit of Liability, Retentions and Coinsurance

A.     The Limit of Liability stated in Item 3. of the Declarations is the limit of the Insurer's liability for all Loss arising out of all Claims first made against the Insureds during the Policy Period and the Discovery Period (if applicable); however, the Limit of Liability for the Discovery Period is part of, and not in addition to, the Limit of Liability for the Policy Period. If the Limit of Liability stated in Item 3. of the Declarations is exhausted by payment of Loss, the Insurer's obligations under this Policy shall be completely fulfilled and extinguished.

B.     The Insurer shall only be liable for that part of covered Loss that is in excess of the applicable Retention stated in Item 4. of the Declarations arising from a Claim, such Retention to be borne by the Insureds uninsured and at their own risk.

C.     Defense Costs are part of, and not in addition to, the Limit of Liability and the Insurer's payment of Defense Costs shall reduce and may exhaust the Limit of Liability.

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 24 of 104 PageID #: 48

D.      With respect to all **Claims**, the applicable Retention shall only apply to the percentage of **Loss** which shall be payable by the **Insurer** (as set forth in E. below) and the applicable Retention shall not apply to the percentage of **Loss** payable by the **Company**.

E.      To the extent **Loss** arising from any **Claim** is covered under the Policy and is in excess of the applicable Retention, the **Insureds** shall bear uninsured and at their own risk that percentage of **Loss** specified as the Coinsurance Percentage in Item 5. of the Declarations and the **Insurer's** liability under this Policy shall only apply to the remaining percentage of such **Loss**.

## V.    Defense, Indemnification and Cooperation

F.      The **Insurer** shall advance, at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds** or the **Company**, severally according to their respective interests, to the extent that the **Insureds** or the **Company** shall not be entitled under the terms and conditions of this Policy to payment of such **Loss**.

G.      The **Insureds**, and not the **Insurer**, have the duty to defend any **Claim** made against the **Insureds**. The **Insurer** shall be entitled to effectively associate in the defense and the negotiation of any settlement of any **Claim**. The **Insureds** shall give the **Insurer** full cooperation and shall not admit or assume any liability, make any settlement offer, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** to which the **Insurer** has consented shall be recoverable as **Loss** under this Policy. The **Insurer's** consent shall not be withheld unreasonably, provided that the **Insurer** shall be entitled to full information and all particulars it may request as to such **Claim**.

## VI.    Notice of Claim or Wrongful Act

A.      As a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall give the **Insurer** written notice of any **Claim** made against an **Insured** as soon as practicable, but in no event later than either:

      1.      the end of the **Policy Period** or the Discovery Period (if applicable); or
      2.      thirty (30) days after the end of the **Policy Period**, as long as such **Claim** is first made within the final thirty (30) days of the **Policy Period**.

B.      If during the **Policy Period**, the **Insureds** become aware of a specific **Wrongful Act** which reasonably may be expected to give rise to a **Claim** being made against the **Insureds** and give written notice to the **Insurer** of the specific **Wrongful Act**, the reasons for anticipating such a **Claim**, the identities of the potential claimants and the **Insureds** allegedly responsible for such specific **Wrongful Act**, the amount of actual or potential damages, and the circumstances by which the **Insureds** first became aware of such specific **Wrongful Act**, then any **Claim** subsequently made against the **Insureds** arising out of such specific **Wrongful Act**, shall be deemed to have been made at the time such notice was received by the **Insurer**.

C.      The **Insureds** shall give notice to the **Insurer** under this Section as specified in Item 9. of the Declarations.

## VII.    Single Claim/Interrelated Wrongful Acts

All **Claims** based upon or arising out of the same **Wrongful Act** or out of **Interrelated Wrongful Acts** shall be considered a single **Claim**, and each such single **Claim** shall be deemed to have been made on the earlier of the following:

Case 3:12-cv-00484    Document 1-4    Filed 05/16/12    Page 25 of 104 PageID #: 49

1.      when the earliest **Claim** arising out of such **Wrongful Act** or **Interrelated Wrongful Acts** first was made; or

2.      when notice pursuant to Section 6.B. above of a fact, circumstance, or situation giving rise to such **Claim** was given.

**VIII.    Discovery Period**

A.     If the **Named Insured** cancels or if the **Insurer** or the **Named Insured** refuses to renew this Policy, the **Named Insured** shall have the right, upon payment of an additional premium of percent of the premium stated in Item 6. of the Declarations, to an extension of the coverage granted by this Policy with respect to any **Claim** first made during the period of time specified in Item 6. of the Declarations immediately following the effective date of such cancellation or non-renewal, but only with respect to any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this Policy. Such period shall be referred to as the "Discovery Period". The right to purchase the Discovery Period shall terminate, however, unless the **Insurer** receives within thirty (30) days of the effective date of cancellation or non-renewal, written notice of such election together with the additional premium due.

B.     The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable.

**IX.     General Conditions**

A.     Cancellation and Non-Renewal

1.      The **Insurer** may only cancel this Policy for non-payment of any premium when due by providing written notice to the **Named Insured** stating when, not less than ten (10) days thereafter, such cancellation shall be effective.

2.      The **Named Insured** may cancel this Policy by providing written notice to the **Insurer** at the address stated in Item 9. of the Declarations stating when thereafter such cancellation shall be effective. The **Insurer** shall retain the customary short rate proportion of the premium; provided, however, if at the time of cancellation the Limit of Liability has been exhausted, the entire premium shall be considered earned. Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

3.      If the **Insurer** decides not to renew this Policy, the **Insurer** shall provide written notice to the **Named Insured** at least sixty (60) days prior to the end of the **Policy Period**. The notice shall include the reason for such non-renewal. In no event shall an offer to renew this Policy on terms that involve any change in Retention amount, premium, Limit of Liability or other terms and conditions constitute a refusal by the **Insurer** to renew this Policy.

4.      Any notices to be given to the **Named Insured** under this section shall be provided to the **Named Insured** at the last known principal address and to its insurance agent or broker. The mailing by certified mail of such notice shall be sufficient.

B.     Action Against the Insurer

No action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, nor until the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial or by written agreement of the **Insureds**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to

Case 3:12-cv-00484    Document 1-4    Filed 05/16/12    Page 26 of 104 PageID #: 50

the extent of the Insurance afforded by this Policy. No person or organization shall have any right under this Policy to join the Insurer as party to any action against the Insureds to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or their legal representatives. Bankruptcy or insolvency of the Company or the Insureds shall not relieve the Insurer of any of its obligations hereunder.

C.  Company Takeover

If during the Policy Period there is a Company Takeover, then this Policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Company Takeover, but there shall be no coverage afforded under this Policy for any actual or alleged Wrongful Act occurring after the effective time of the Company Takeover. This Policy may not be canceled after the effective time of the Company Takeover and the entire premium for this Policy shall be deemed earned as of such time. The Named Insured shall give the Insurer written notice of the Company Takeover as soon as practicable but not later than 30 days after the effective date of the Company Takeover.

D.  Mergers and Acquisitions

1.  If during the Policy Period the Company acquires another entity by merger or by consolidation with a Subsidiary, acquires all or substantially all of the assets of another entity, or creates or acquires a Subsidiary and if the assets acquired through such transaction are ten percent (10%) or less of the total consolidated assets of the Named Insured as of the inception of this Policy then, subject to all the other provisions of this Policy, coverage shall automatically apply to any Claim involving the merged or consolidated entity, Subsidiary, or assets.

2.  If during the Policy Period the Company acquires another entity by merger or by consolidation with a Subsidiary, acquires all or substantially all of the assets of another entity, or creates or acquires a Subsidiary and if the assets acquired through such transaction are more than ten percent (10%) of the total consolidated assets of the Named Insured as of the inception of this Policy then, subject to all the other provisions of this Policy, no coverage shall apply to any Claim involving the merged or consolidated entity, Subsidiary or assets unless the Named Insured provides the Insurer with full particulars of such transaction, agrees to any additional premium and/or amendment of the provisions of this Policy the Insurer requires and pays any premium required.

3.  There shall be no coverage for any Wrongful Act involving the merged or consolidated entity, Subsidiary, or assets that occurred prior to the consummation of a transaction described in 1. or 2. above, or for any other Wrongful Act whenever occurring which together with a Wrongful Act that occurred prior to the consummation of such transaction would constitute Interrelated Wrongful Acts.

4.  There shall be no coverage for any Wrongful Act of any Subsidiary or any of its directors, officers or employees occurring on or after the date such entity ceases to be a Subsidiary.

E.  Representations

The Insureds agree that the Application is deemed attached to this Policy and incorporated herein. The Insureds further agree that all statements, representations and information contained in or incorporated into the Application are their representations and are material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations.

The Insureds further agree that in the event of any material misstatement, misrepresentation or omission in the Application, this Policy will be void as to any

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 27 of 104 PageID #: 51

Insured who knew of such misstatement, misrepresentation or omission and as to any Insured to whom such knowledge is imputed. For the purpose of determining such imputation, the Insureds agree that any knowledge possessed by the Chief Executive Officer, the Chief Financial Officer, the in-house General Counsel, Risk Manager, the President or the Chairman of the Board of Directors of the Named Insured shall be imputed to the Company. The knowledge of any of the directors, officers or employees shall not be imputed to any other directors, officers or employees.

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 28 of 104 PageID #: 52

F.  Other Insurance

Such insurance as is provided by this Policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written only as specific excess insurance over the Limit of Liability provided by this Policy. This Policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a Claim for which this Policy may be obligated to pay Loss.

G.  Subrogation

1. In the event of payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the rights of recovery of the Insureds against any person or organization. The Insureds shall execute and deliver all papers and instruments required and shall and do whatever else is necessary to enable the Insurer effectively to bring suit in their name and otherwise secure such rights. The Insureds shall do nothing to prejudice any such rights.

2. Any amount recovered after payment under this Policy shall be apportioned in the inverse order of payment to the extent of the actual payment. The expenses incurred in obtaining any such recoveries shall be apportioned in the ratio of the respective recoveries.

H.  Assignment

This Policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

I.  Entire Agreement

By acceptance of this Policy, the Insureds and the Insurer agree that this Policy (including the Application) and any written endorsements attached hereto constitute the entire agreement between the parties.

J.  Conformity to Statute

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy are hereby amended to conform to such laws.

K.  Authorization

The Insureds agree that the Named Insured will act on behalf of all of the Insureds with respect to the payment or return of premium, the receipt and acceptance of any endorsements, the cancellation of the Policy, the negotiation of renewal, and the giving and receiving of any notice provided for by the terms and conditions of this Policy.

L.  Worldwide Territory

The Policy shall apply to Claims made against the Insureds anywhere in the world.

X.  Service of Suit

If the Insurer fails to pay any amount claimed to be due under this Policy, the Insurer, at the request of any of the Insureds, will submit to the jurisdiction of any court of competent jurisdiction within the United States, and will comply with all requirements necessary to give such court jurisdiction. Nothing in this Clause constitutes or should be understood to constitute a waiver of the Insurer's rights to commence an action in any Court of competent jurisdiction in the United

PLIC 051 0408

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 29 of 104 PageID #: 53

States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

The **Insurer** hereby designates the Superintendent, Commissioner or Director of Insurance or similar officer specified by law for that purpose, or his or her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any **Insured** under the Policy. Upon receipt of process lawfully served, that official may mail such process to Claim Manager- Professional Liability at the address stated at Item 9. of the Declarations.

XI.   **Headings**

The descriptions in the headings and any subheading of this policy (including any titles given to any endorsement attached hereto) are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

THIS POLICY SHALL NOT BE VALID UNLESS COMPLETED BY THE ATTACHMENT HERETO OF A DECLARATION PAGE AND SIGNED BY A DULY AUTHORIZED REPRESENTATIVE OF THE INSURER.

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 30 of 104 PageID #: 54

# IN WITNESS ENDORSEMENT

## CATLIN SPECIALTY INSURANCE COMPANY

ADMINISTRATIVE OFFICE:   3340 Peachtree Road N.E.
Suite 2950
Atlanta, GA 30326

STATUTORY HOME OFFICE:   160 Greentree Drive
Suite 101
Dover, Delaware 19904

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company

Richard S. Banas
President

Steven C. Adams
Secretary

ABAP 401 0807

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SERVICE OF SUIT

The following service of suit provision is added and replaces any other Service of Suit provision contained elsewhere in this policy:

The Superintendent, Commissioner or Director of Insurance of the State is hereby designated the true and lawful attorney of the Company upon whom may be served all lawful process in any action, suit or proceeding arising out of this policy. The Company further designates:

**Steve Adams**
**Legal Counsel**
**3340 Peachtree Road N.E.**
**Suite 2950**
**Atlanta, GA 30326**

as its agent to whom such process shall be forwarded by the Director of Insurance.

For Illinois exposures, the Insurer further designates the Director of the Illinois Division of Insurance and his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of an Illinois exposure and this contract of insurance.

All other terms, conditions and exclusions remain unchanged.

ABAP 900 1008

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

# CREDIT RATING TRIGGER CANCELLATION ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that Section IX. **General Conditions** A. (Cancellation and Non-Renewal) of this Policy is amended by adding the following paragraph:

5.  Notwithstanding the foregoing, in the event that a financial strength rating is issued (1) below A- by A.M. Best Co., or (2) below BBB by Standard & Poor's Ratings Services, for the **Insurer** (hereinafter referred to as a "Credit Rating Downgrade"), this Policy may be cancelled by the **Named Insured** by mailing written prior notice to the **Insurer** or by surrender of this Policy to the **Insurer** or its authorized written agent. If this Policy is canceled by the **Named Insured** within thirty (30) days after such Credit Rating Downgrade, the **Insurer** shall retain the pro rata proportion of the premium herein.

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective:_____   Policy No.: _____   Endorsement No. ___1___

Insured: _____   Premium:_____

Insurance Company:_____

Authorized Signature:   _____

PLIC 400 0709

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 33 of 104 PageID #: 57

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED DEFINITION OF APPLICATION ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

Section II. **Definitions** A. is amended by deleting subsection 2. and replacing it with the following:

   2.     to the extent made by or required of the **Insureds**:

any public documents filed within twelve (12) months of the inception date of this Policy by the Named Insured with the Securities and Exchange Commission or any similar federal, state, local or foreign regulatory body, and any other written public statement or certification required by law to be made by the chief executive officer, chief financial officer or other executive officer of the Named Insured within twelve (12) months of the inception date of this Policy regarding the accuracy, completeness or adequacy of such Insured's financial statements, SEC filings, or internal controls;

whether or not such public documents, statements or certifications are furnished to the **Insurer.**

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective:_____     Policy No.: _____     Endorsement No. __2____

Insured: _____     Premium:_____

Insurance Company:_____

Authorized Signature:     _____

PLIC 401 0709

**Page 1 of 1**

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 34 of 104 PageID #: 58

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED DEFINITION OF INSUREDS ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

Section II. Definitions F. is amended by addition of the following subsection:

3.    the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of any person identified in 2. above for a Claim arising solely out of his or her status as the spouse of that person, including a Claim that seeks damages recoverable from marital community property, property jointly held by the spouse and that person, or property transferred from that person to such spouse; provided, however, no coverage shall be provided under this Policy for any Claim for any actual or alleged Wrongful Act of such spouse.

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective: _____    Policy No.: _____    Endorsement No. __3___

Insured: _____    Premium: _____

Insurance Company: _____

Authorized Signature: _____

PLIC 403 0709

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED DISHONESTY/PERSONAL PROFIT
# EXCLUSION ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

Section III. Exclusions A. and B. are deleted and replaced by the following:

A.  brought about or contributed to by the gaining in fact of any profit or advantage to which an Insured was not legally entitled or the committing in fact of any criminal act;

B.  brought about or contributed to by the committing in fact of any deliberately fraudulent act or deliberate conflict of interest;

If such profit or advantage, criminal or deliberately fraudulent act or deliberate conflict of interest is established by any judgment or final adjudication; provided, however, that for the purpose of determining the applicability of Exclusions A. and B., the Wrongful Act of any natural person who was, now is or shall be a duly elected or appointed director, officer or employee of the Company shall not be imputed to any other director, officer or employee, but such Wrongful Act shall be imputed to the Company;

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective:_____   Policy No.:_____   Endorsement No. __4___

Insured: _____   Premium:_____

Insurance Company:_____

Authorized Signature: _____

PLIC 404 0709

Page 1 of 1

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDED SUBROGATION ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

Section IX. General Conditions G. (Subrogation) is deleted in its entirety and replaced with the following:

1. In the event of payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the rights of recovery of the Insureds against any person or organization. The Insureds shall execute and deliver all papers and instruments required and shall and do whatever else is necessary to enable the Insurer effectively to bring suit in their name and otherwise secure such rights. The Insureds shall do nothing to prejudice any such rights.

2. Any amount recovered after payment under this Policy shall be apportioned in the inverse order of payment to the extent of the actual payment. The expenses incurred in obtaining any such recoveries shall be apportioned in the ratio of the respective recoveries.

3. In no event, however, shall the Insurer exercise its rights of subrogation against an Insured under this Policy unless such Insured has been convicted of a deliberate fraudulent act, or been determined by any final adjudication to have obtained any profit or advantage to which such Insured was not legally entitled.

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Endorsement Effective:_____     Policy No.: _____     Endorsement No. __5___

Insured: _____     Premium:_____

Insurance Company:_____

Authorized Signature: _____

PLIC M002 0709                                                                                              **Page 1 of 1**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDED NOTICE OF CLAIM OR WRONGFUL ACT ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

Section VI. Notice of Claim or Wrongful Act is amended by replacing the phrase "thirty (30) days" wherever it appears in subsection A.2. with the phrase "sixty (60) days."

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Endorsement Effective:_____    Policy No.: _____    Endorsement No. __6___

Insured: _____    Premium:_____

Insurance Company:_____

Authorized Signature: _____

PLIC M003 0709

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY EXCLUSION

In consideration of the premium charged, it is understood and agreed that the Policy is amended by the addition of the following:

This Policy provides no coverage in connection with any **Claim**:

A.   arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving **Hazardous Properties** of **Nuclear Material**, including but not limited to:

   1.   **Nuclear Material** located at any **Nuclear Facility** owned by, or operated by or on behalf of any **Insured** or discharged or dispersed therefrom; or
   2.   **Nuclear Material** contained in **Spent Fuel** or **Waste** which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any **Insured**; or
   3.   the furnishing by any **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**; or
   4.   claims for damage or other injury to any of the **Insureds** or any of their shareholders, partners or stakeholders, which arise out of, are based upon or in consequence of, directly or indirectly result from, or in any way involve, the **Hazardous Properties** of **Nuclear Material**.;

B.   which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its limit of liability; or,

C.   with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insureds** are, or had this policy not been issued, would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into with the United States of America, or any agency thereof, or with any person or organization.

For the purpose of this Endorsement the words appearing in **bold-face** have particularized meanings as defined below:

**Hazardous Properties** include radioactive, toxic or explosive properties;

**Nuclear Material** means **Source Material**, **Special Nuclear Material** or **Byproduct Material**;

**Source Material**, **Special Nuclear Material**, and **Byproduct Material** have the meanings given them in the Atomic Energy Act of 1954 or in law amendatory thereof;

**Spent Fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **Nuclear Reactor**;

**Waste** means any waste material (1) containing **Byproduct Material** and (2) resulting from the operation by any person or organization of any **Nuclear Facility** included within the definition of **Nuclear Facility** under paragraph (a) or (b) thereof;

**Nuclear Facility** means:

PLMP 601 0408

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 39 of 104   PageID #: 63

1.  any Nuclear Reactor;

2.  any equipment or device designed or used for:
    a.    separating the isotopes of uranium or plutonium;
    b.    processing or utilizing Spent Fuel; or
    c.    (3) handling, processing or packaging Waste;

3.  any equipment or device used for the processing, fabricating or alloying of **Special Nuclear Material** if at any time the total amount of such material in the custody of the **Insureds** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

4.  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of **Waste**, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**Nuclear Reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.


All other provisions of this Policy remain unchanged.


This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

| | | |
|---|---|---|
| Endorsement Effective _____ | Policy No. _____ | Endorsement No. ___7___ |
| Insured _____ | | Premium _____ |
| Insurance Company _____ | Authorized Signature | _____ |

**PLMP 601 0408**

**Page 2 of 2**

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 40 of 104 PageID #: 64

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED MERGERS AND ACQUISITIONS
# THRESHOLD ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

Section IX. General Conditions D. Mergers and Acquisitions is amended by replacing the phrase "ten percent (10%)" wherever it appears therein with the phrase "twenty-five (25%)."

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective:_____   Policy No.: _____   Endorsement No. 8

Insured: _____   Premium:_____

Insurance Company:_____

Authorized Signature: _____

PLIC 405 0709

Page 1 of 1

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDED DISCRIMINATION ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

**Section III. Exclusions, Subsection S. is deleted in its entirety and replaced with the following:**

S.    for any discrimination; provided, however, this exclusion shall not apply to any **Claim** by any policyholder of the **Insured** for any discrimination in the **Insured's** claims handling or adjusting.

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective:_____    Policy No.: _____    Endorsement No. __9___

Insured: _____    Premium:_____

Insurance Company:_____

Authorized Signature: _____

PLIC 603 0710

**Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED COINSURANCE ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

Section IV. Limit of Liability, Retentions and Coinsurance, Subsection E. is deleted in its entirety and replaced with the following:

E.   To the extent **Loss** arising from any **Claim** is covered under this Policy and is in excess of the applicable Retention, the **Insureds** shall bear uninsured and at their own risk:

1.   20% of such **Loss** arising out of any **Claim** that is commenced as a putative class action or later amended to seek class action status; or

2.   that percentage of such **Loss** specified as the Coinsurance Percentage in Item 5. of the Declarations arising out of any **Claim** not specified in Subsection E.1. above;

and the **Insurer's** liability under this Policy shall only apply to the remaining percentage of such **Loss**

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective:_____     Policy No.: _____     Endorsement No. __10___

Insured: _____     Premium:_____

Insurance Company:_____

Authorized Signature: _____

PLIC M051 0710                                                                                                  **Page 1 of 1**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDED DEFINITION OF CLAIM ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

Section II. **Definitions**, Subsection B. is deleted in its entirety and replaced with the following:

B.    "Claim" means:

     1.    a written demand for monetary or non-monetary relief made upon an **Insured**;

     2.    a civil or criminal proceeding (including an arbitration or mediation proceedings) for monetary or non-monetary relief against an **Insured** which is commenced by service of a complaint or similar pleading or return of an indictment or information in the case of a criminal proceeding;

     3.    any administrative or regulatory proceeding for monetary or non-monetary relief against an **Insured** which is commenced by receipt of a notice of charges; or

     4.    a civil, criminal, administrative or regulatory investigation of an **Insured** for a **Wrongful Act**, but only after such **Insured** is identified in writing by the investigating authority as an entity or person against whom a proceeding described in 2. above may be commenced.

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective:_____    Policy No.:_____    Endorsement No. ___11____

Insured: _____    Premium:_____

Insurance Company:_____

Authorized Signature:    _____

PLIC M052 0710

Page 1 of 1

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 44 of 104 PageID #: 68

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDED REPRESENTATIONS ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

Section IX. General Conditions, Subsection E. is deleted in its entirety and replaced with the following:

E.    Representations

The Insureds agree that the Application is deemed attached to this Policy and incorporated herein. The Insureds further agree that all statements, representations and information contained in or incorporated into the Application are their representations. This Policy is issued in reliance upon the truth of such representations.

The Insureds further agree that in the event of any material misstatement, misrepresentation or omission in the Application, this Policy will be void as to any Insured who knew of such misstatement, misrepresentation or omission and as to any Insured to whom such knowledge is imputed. For the purpose of determining such imputation, the Insureds agree that any knowledge possessed by the Chief Executive Officer, the Chief Financial Officer or the in-house General Counsel of the Named Insured shall be imputed to the Company. The knowledge of any of the directors, officers, or employees shall not be imputed to any other directors, officers, or employees.

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective:_____    Policy No.: _____    Endorsement No. __12__

Insured: _____    Premium:_____

Insurance Company:_____

Authorized Signature: _____

PLIC M053 0710

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED SEVERABILITY PROVISION ENDORSEMENT

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Policy is amended as follows:

The unnumbered paragraph following Section III. **Exclusions.** Subsection B. is deleted in its entirety and replaced with the following:

> provided that for the purposes of determining the applicability of Exclusions A. and B., the **Wrongful Act** of any natural person who was, now is or shall be a duly elected or appointed director, officer, or employee of the **Company** shall not be imputed to any other director, officer, or employee, but the **Wrongful Act(s)** of the Chief Executive Officer, Chief Financial Officer, and in-house General Counsel shall be imputed to the **Company.**

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective:_____      Policy No.: _____      Endorsement No. ___13___

Insured: _____      Premium:_____

Insurance Company:_____

Authorized Signature: _____

PLIC M054 0710                                                                                                    Page 1 of 1

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DELETION OF EXCLUSION ENDORSEMENT

In consideration of the payment of the premium for this Policy, It is hereby understood and agreed that the Policy Is amended as follows:

Section III. Exclusions V. Is deleted.

All other terms, conditions and exclusions remain unchanged.

This endorsement changes the policy to which It is attached and is effective on the date issued unless otherwise stated.

**(The Information below Is required only when this endorsement Is Issued subsequent to preparation of the policy.)**

Endorsement Effective:_____     Policy No.: _____     Endorsement No. ___14___

Insured: _____     Premium:_____

Insurance Company:_____

Authorized Signature: _____

PLIC 406 0709                                                                              **Page 1 of 1**

# PRIVACY POLICY

Catlin insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality. For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies. For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way. In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

## Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us. Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products. We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you. Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the Catlin insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

## Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services. The information we collect generally comes from the following sources:

>   Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;

>   Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you. The information we collect will vary with the type of insurance you seek;

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 48 of 104 PageID #: 72

Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;

Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies. The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you. We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so. The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim. In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and

Credit and Financial Reports – We may receive information about you and your business regarding your credit. We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

## Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law. If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

## Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

## Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law. Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party. Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment. "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information [piloting, skydiving, etc.] solvency, etc. We also do not disclose to any unaffiliated third party a policy or account number for use in marketing. We may share with our affiliated companies information that relates to our experience and transactions with the customer.

## Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed. However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

## Access to Your Information

PNAP 002 0209

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 49 of 104 PageID #: 73

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you. We may also disclose information about you to the following categories of person or entities:

Your independent insurance agent or broker;

An independent claim adjuster or investigator, or an attorney or expert involved in the claim;

Persons or organizations that conduct scientific studies, including actuaries and accountants;

An insurance support organization;

Another insurer if to prevent fraud or to properly underwrite a risk;

A state insurance department or other governmental agency, if required by federal, state or local laws; or

Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

**Violation of the Privacy Policy**

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

PNAP 002 0209

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning the possible impact on your insurance coverage provided under your policy due to directives issued by OFAC. Please read this Policyholder Notice carefully.

OFAC administers and enforces economic and trade sanctions based on US foreign policy and national security goals based on Presidential declarations of "national emergency." OFAC has identified and listed numerous:

> Foreign agents
> Front organizations
> Terrorists
> Terrorist organizations
> Narcotics traffickers

as "Specially Designated Nationals and Blocked Persons." This list can be found on the United States Treasury's web site – http://www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated US sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments may also apply.

# TENNESSEE

FOR INFORMATION, OR
TO MAKE A COMPLAINT, CALL:

1-877-CATLIN-US
or
1-877-228-5468

Catlin, Inc.
1600 Market Street,
Suite 1616
Philadelphia, PA 19103

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 52 of 104 PageID #: 76

# CLAIMS NOTICE

All claims must be reported to Catlin at:

**Catlin**
**3340 Peachtree Road N.E.**
**Suite 2950**
**Atlanta, GA  30326**

**E-mail:** catlinclaimspl@catlin.com
**Phone:** 404-443-4910\888-443-4910
**Fax:**    404-443-4912

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 53 of 104 PageID #: 77

# EXHIBIT B

## SETTLEMENT DEMAND LETTER

### [attached]

15



**ATTORNEYS AT LAW**



FILED

2012 MAR -7 PM 12: 29

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

_____ D.C. & M

May 6, 2011

Jeffrey Humphries, Esq.
O'Hara Law Firm
4811 Beach Blvd., #303
Jacksonville, FL 32207

Re:    **Pittman v. Minson**

Dear Mr. Humphries:

Enclosed please find the economic reports for Justin and Chelsea Pittman.  We had previously provided you with the neurologist and neuropsychologist reports as well for both.  As the records demonstrate, Justin and Chelsea have sustained catastrophic brain injuries with significant economic damages.  At this time, we make a demand for settlement to your for $14,000,000.00 for Justin Pittman; $7,000,000.00 for Chelsea Pittman and $500,000.00 for Wendy Pittman (consortium claim).

Thank you for your attention and cooperation in this matter.

Very truly yours,

Louis R. Battista

Enclosures

Toral Professional Building 4790 Davie Road Suite 303 Ft. Lauderdale, FL 33314
t 954 703 2960  tf 8, 3 TORAL LAW  877 867 2552  f 954 703 2976
An AV Rated Law Firm   www.torallaw.com
FT. LAUDERDALE   TAMPA   TALLAHASSEE

# EXHIBIT C

## FAC MAY 27, 2011 LETTER

### [attached]

16

743321.1

# BARNES&THORNBURG LLP

FILED

2012 MAR -7 PM 12: 33

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

_____ Era ____ D.C. & M.

May 27, 2011

<u>Via E-mail to rdion@lockton.com</u>
<u>and Via Facsimile to: (213) 873-0553</u>

Raymond C. Dion, Esq.
Vice President
Insurance & Claims Counsel
Lockton Insurance Brokers, LLC
725 South Figueroa Street
35th Floor
Los Angeles, CA 90017

|     | Re: | Matter: | *First Acceptance Insurance Corporation -* |
|-----|-----|---------|-----|

Re:  Matter:  *First Acceptance Insurance Corporation -*
                *Notice of Circumstances*
       Insurer:   Catlin Specialty Insurance Company ("Catlin")
       Policy #:  ICP-91968-0710 ("Policy")
       Your Claim #: 102817

Dear Mr. Dion:

As you may recall, I represent First Acceptance Corporation ("FAC") and, on its behalf, hereby request and instruct Lockton Insurance Brokers to report the following "circumstances" to Catlin Specialty Insurance Company on or before the expiration of the current Policy on July 1, 2011, 12:01 AM (local time at Nashville, Tennessee).

The Notice of Circumstances below are to be reported pursuant to Section VI "Notice of Claim or Wrongful Act" under the above-referenced policy.

*Pittman v. Minson*

This case involves a motor vehicle accident whereby the insured driver Josh Minson was involved in a motor vehicle accident with another vehicle while the Minson vehicle was allegedly being chased by a third vehicle. Justin and Chelsea Pittman were passengers in the insured Minson vehicle. As a result of the accident, Justin and Chelsea Pittman claim permanent brain injury with significant cognitive deficits resulting in severe limitations in their ability to work, drive and function socially.

Subsequent to notice of the accident, the Insured's claim adjuster tendered the limits to all claimants and instructed the claimants to work it out among themselves as to how the limits would be divided. The claim was later assigned to defense counsel who arranged for a global

settlement conference with all claimants. The day before the global settlement conference, plaintiffs Justin and Chelsea Pittman withdrew, indicating that the timing of setting up the global settlement conference was too slow and that the Insured should not have settled other claims using the policy limits before settling with the more seriously injured Pittman claimants.

Up until May 6, 2011, the Pittmans' counsel had not provided the insured with any formal settlement demand on behalf of his clients. On May 6, 2011, plaintiffs' counsel provided the attached letter demanding $21,500,000 on behalf of the Pittmans ($14,000,000 for Justin Pittman, $7,000,000 for Chelsea Pittman, and $500,000 for Wendy Pittman, Justin and Chelsea's mother). As the attorney's letter references a demand well in excess of the driver's insured limits, FAC reasonably expects the plaintiffs will bring a bad faith and/or negligent claims handling claim against FAC for allegedly failing to offer policy limits timely to the Pittman plaintiffs. The Insured now reasonably expects the alleged Wrongful Acts of failing to offer timely the policy limits and settling the claims of other less-injured claimants utilizing the policy limits may give rise to a Claim under the Policy. The identities of the potential claimants include Justin, Chelsea and Wendy Pittman, and James and Joshua Minson. The Insureds allegedly responsible for such specific Wrongful Acts would include First Acceptance Corporation and its claims employees. The amount of actual or potential damages at this juncture is alleged to be $21,500,000 based upon the May 6, 2011 demand letter from Louis R. Battista. The circumstances by which the Insured first became aware that such alleged Wrongful Acts may reasonably be expected to give rise to a Claim being made against the Insured came about through the May 6, 2011 letter, coupled with statements made by plaintiffs' counsel at the mediation of this case on May 19, 2011 (which mediation ended with no resolution).

The foregoing matters should be reported to Catlin pursuant to Section VI "Notice of Claim or Wrongful Act" under the above-referenced Policy. If you require any additional information regarding this matter, please contact me immediately.

Sincerely,

James J. Leonard

JJL/jkt

Enclosure

cc:    Mark P. Reineke
       Daniel Walker
       Scott Walker
       Sarannah L. McMurtry

ATDS01 JLEONARD 158481v1

BARNES&THORNBURG LLP

**EXHIBIT D**

**LOCKTON JUNE 7, 2011 LETTER**

[attached]

17

743321.1



**LOCKTON**
Insurance and Risk Management Specialists

FILED

2012 MAR -7 PM 12: 29

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

Ed.         D.C.&M

June 7, 2011

_Via Certified Mail an E-mail (catlinclaimspl@catlin.com)_

Catlin, Inc.
Attn: Claim Manager – Professional Liability
140 Broadway, 43th Floor
New York, NY 10005

Insured:                First Acceptance Corp.
Policy Number:          ICP-91968-0710 (E&O)
Policy Term:            July 1, 2010 to July 1, 2011
Retention Amount:       $1,000,000.00
Claimants:              Pittman v. Minson

RE:     NOTICE OF CIRCUMSTANCES – Pittman v. Minson

To Claim Manager – Professional Liability:

Pursuant to the Notice provisions of the above-referenced policy, we are hereby reporting this matter. Please find a copy of the attached 5/27/11 letter from Barnes & Thornburg LLP and a copy of the attached 5/6/11 demand letter from Toral Garcia Battista. The summary of the Notice of Circumstances is as follows:

_Pittman v. Minson_

This case involves a motor vehicle accident whereby the insured driver Josh Minson was involved in a motor vehicle accident with another vehicle while the Minson vehicle was allegedly being chased by a third vehicle. Justin and Chelsea Pittman were passengers in the insured Minson vehicle. As a result of the accident, Justin and Chelsea Pittman claim permanent brain injury with significant cognitive deficits resulting in severe limitations in their ability to work, drive and function socially.

Subsequent to notice of the accident, the Insured's claim adjuster tendered the limits to all claimants and instructed the claimants to work it out amont themselves as to how the limits wuold be divided. The claim was later assigned to defense counsel who arranged for a global settlement conference with all claimants. The day before the global settlement cnference, plaintiffs Justin and Chelsea Pittman withdrew, indicating that the timing of settlign up the global settlement conference was too slow and that the Insured should not have settled other claims using the policy limits before settling with the more seriuosly injured Pittman claimants.

Up until May 6, 2011, the Pittman's counsel had not provided the insured with any formal settlement demand on behalf of his clients. On May 6, 2011, plaintiffs' counsel provided the attached letter demanding $21,500,000 on behalf of the Pittmans ($14,000,000 for Justin Pittman, $7,000,000 for Chelsea Pittman, and $500,000 for Wendy Pittman, Justin and Chelsea's mother). As the attorney's letter references a demand well in excess of the driver's insured limits, FAC reasonably expects the plaintiffs will bring a bad faith and/or negligent claims handling claim against FAC for allegedly failing to offer

LOCKTON INSURANCE BROKERS, LLC
License #0F15767
3657 Briarpark Dr #11, Los Angeles CA 90017 · (213) 689-0303 · FAX (213) 689-0307



**LOCKTON**

Insurance and Risk Management Specialists

policy limits timely to the Pittman plaintiffs. The Insured now reasonably expects the alleged Wrongful Acts of failing to offer timely the policy limits and settling the claims of other less-insured claimants utilizing the policy limits may give rise to a Claim under the Policy. The identities of the potential claimants include Justin, Chelsea and Wendy Pittman, and James and Joshua Minson. The insureds allegedly responsible for such specific Wrongful Acts would include First Acceptance Corporation and its claims employees. The amount of actual or potential damages at this juncture is alleged to be $21,500,000 based upon the May 6, 2011 demand letter from Louis R. Battista. The circumstances by which the Insured first became aware that such alleged Wrongful Acts may reasonably be expected to give rise to a Claim being made against the Insured came about through the May 6, 2011 letter, coupled with statements made by plaintiffs' counsel at the mediation of this case on May 19, 2011 (which mediation ended with no resolution.

We request that you provide the Insured with your claims / litigation management guidelines, such as choice of counsel limitations, acceptable fee per hour, etc., as soon as practicable. We further request that you provide the Insured with an acknowledgement letter within ten (10) days of receiving this notice. Please provide your coverage position within thirty (30) days of receipt of this notice. The acknowledgement letter, coverage position and any other correspondence which are not considered privileged by the attorney-client relationship should be addressed to the Insured with a copy to Lockton.

The Insured's contact information is as follows:

Mark P. Reineke
VP Legal Affairs
First Acceptance Corp.
3322 West End Avenue, Suite 1000
Nashville, Tennessee 37203
Office: 615.844.2834
Cell:     615.238.4775
E-mail: MReineke@facIns.com

Also, please copy Lockton on all correspondence through the undersigned via e-mail. Again, we would appreciate your timely acknowledgement of receipt of this notice within the next ten (10) days with the assigned claim adjuster's information and assigned claim number.

LOCKTON INSURANCE BROKERS, LLC
License 0F14705
725 S. Figueroa St., 35th Fl / Los Angeles, CA 90017 / (213) 689-2330 / FAX: (213) 689-0524

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 61 of 104 PageID #: 85



**LOCKTON**

Insurance and Risk Management Specialists

Thank you for your attention to this matter. Should you have any questions or comments please do not hesitate to contact us.

Sincerely,

Larianna Danielyan                  and          Raymond Dion, Esq.
Claims Coordinator                                Vice President, Insurance & Claims Counsel
Lockton Insurance Brokers, LLC                    Lockton Insurance Brokers, LLC
725 S. Figueroa Street, 35th Floor               725 S. Figueroa St., 35th Floor
Los Angeles, CA 90017                             Los Angeles, CA 90017
Phone: 213-689-2388                               Phone: 213-689-2334
Fax:    213-873-2388                              Fax:    213-873-2334
E-mail: ldanielyan@lockton.com                    Email:  rdion@lockton.com

cc:     Mark P. Reineke – First Acceptance Corporation

**EXHIBIT E**

**CATLIN ACKNOWLEDGEMENT**

[attached]

18

FILED

Date: 06/20/2011

2012 MAR -7 PM 12: 29

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

Em D.C. & M

First Acceptance Corporation
3813 Green Hills Village Dr
Nashville, TN 37215

RE:  Insured:        First Acceptance Corporation
     Company:        Catlin Underwriting Agency of New York
     Claimant:       Justin Pittman; Chelsea Pittman
     Policy Number:  ICP-91968-0710
     Policy Period:  07/01/2010 - 07/01/2011
     Claim Number:   NYU-PL-114906

Dear Sir/Madam:

We acknowledge receipt of your loss notice regarding the above captioned claim. We understand that you are the contact person concerning this matter and that insurance related correspondence should be directed to your attention. If this information is incorrect, kindly provide us with the correct contact information for the person we should communicate with.

The initial handling of this matter has been assigned to Inna Kogan here at Catlin. You will be contacted shortly and that contact may be from our assigned investigator. Should you have any questions or in the interim need to discuss this matter you may reach Inna Kogan at (212) 801-3411 or by email at inna.kogan@catlin.com.

We wish to also take this opportunity to advise you that while conducting an investigation and pending completion of our investigation, we cannot comment on liability or the existence/non-existence of coverage under the policy. Therefore, please do not construe our ensuing actions, requests or recommendations as a waiver or modification of the policy terms, conditions and provisions. All Terms, Conditions and Provisions are specifically reserved.

Should you have any questions, comments or concerns, please do not hesitate to contact us.

Sincerely,

Catlin, Inc.

cc:  Lockton Companies International
     The St Botolph Bldg.,138 Houndsditch
     London, EC3A 7AG

**EXHIBIT F**

**KOGAN JULY 27, 2011 E-MAIL**

**[attached]**

19

743321.1

**From:** Kogan, Inna [mailto:Inna.Kogan@catlin.com]
**Sent:** Wednesday, July 27, 2011 3:36 PM
**To:** Leonard, Jim
**Cc:** Sarannah L. McMurtry; Mark Reineke
**Subject:** [BULK] RE: First Acceptance Corp. - Hall vs. Estes
**Importance:** Low

FILED

2012 MAR -7 PM 12: 29

CLERK & MASTER
DAVIDSON CO. CHANCERY CT

*C AD* .D.C.&H

Jim,

Thank you for the follow up and for taking the time to discuss the above-referenced matter with me.

I have had a chance to speak with Jessica, and she has confirmed that you had previously come to an understanding that First Acceptance has no obligation to report Notices of Circumstance. I do not want to go against what has been previously communicated to you, and therefore will adhere to your prior understanding that although First Acceptance has the option to, they are not obligated to report matters that have not yet given rise to a Claim. That said, I highly encourage you to report anything that appears that it may result in a Claim.

Additionally, I want to take this opportunity to thank all of you for taking the time to discuss this matter, especially in light of the fact that this appears to be a question that you had already spent time on in the past. It is my hope that going forward we will be able to keep lines of communication open and resolve any other matters that arise.

I will issue a coverage-position letter on behalf of Catlin advising that we are accepting this matter as a Notice of Circumstances. In the interim, please let me know if you have any questions, concerns, or would like to further discuss this matter.

With kind regards,

Inna Kogan. Esq.
Senior Claims Examiner
Catlin, Inc.
212-801-3411 - Direct
Inna.Kogan@catlin.com

**EXHIBIT G**

**CATLIN SEPTEMBER 1, 2011 LETTER**

**[attached]**

20

FILED

2012 MAR -7 PM 12: 29

CLERK & MASTER
DAVIDSON CO. CHANCERY CT

Ex. N.C. 8:4

Inna Kogan, Esq.
Financial Square
32 Old Slip
36th Floor
New York, NY 10005
Tel (212) 801-3400
Fax (212) 801-3401
www.catlin.com

September 1, 2011

**VIA FIRST CLASS MAIL**
Mr. Mark P. Reineke
VP Legal Affairs
First Acceptance Corp.
3813 Green Hills Village Drive
Nashville, Tennessee 37215

Re:      Named Insured:    First Acceptance Corporation
           Insurer:              Catlin Insurance Company (UK) Ltd.
           Matter:               Pittman
           Policy No.:         ICP-91968-0710
           Our File No.:       NYU-PL-114906

Dear Mr. Reineke:

On behalf of Catlin Insurance Company (UK), Ltd. ("Catlin") this will further acknowledge receipt of your correspondence regarding a complaint styled <u>Wendy Pittman et. al. v. James Minson and Joshua Minson</u>, filed in the Circuit Court of the Third Judicial Circuit in and for Columbia County, FL. This litigation stems from alleged damages sustained by the Plaintiffs as the result of an automobile accident occurring August 12, 2007. Pursuant to the information that has been made available to Catlin, Defendant Joshua Minson, the driver of the vehicle involved in the auto accident, was insured by First

**I.      Catlin Policy**

Subject to all its terms and conditions, Catlin issued First Acceptance an Insurance Agency Professional Liability Insurance Policy No IAB-6030-0810. The Policy is a "claims made and reported" policy that only affords coverage for Claims first made against the Insureds and first reported to the Insurer in writing during the Policy Period. The Policy Period runs from July 7, 2010 to July 7, 2011.

In light of your correspondence I kindly direct your attention to Section I. <u>Insuring Agreement</u> which indicates as follows:

      The Insurer shall pay, on behalf of the Insured, Loss arising from any Claim by a policyholder or third party client first made against the Insured during the Policy Period or the Discovery Period (if applicable) and reported to the insurer during such period pursuant to the terms of this Policy for a Wrongful Act in the rendering of or failure to render Professional Services to the claimant.

Also, please note that, in pertinent part, "Claim means a written demand for monetary or non-monetary relief made upon an Insured; [or] a civil or criminal proceedings... Wrongful Act is defined and "any breach of duty, neglect, error, misstatement, or misleading statement, omission or act by an Insured." The definition of Professional Services includes, but is not limited to, "the soliciting, placing, selling or servicing" various types of insurance. The terms Professional Services is defined as "the services performed by an Insured for a policy holder or third party client pursuant to a written contract with such

policyholder or third party client for a fee, commission or other remuneration or financial consideration with insured to the benefit of the Company."

Additionally please be advised that in relevant part Section VI. Notice of Circumstances Giving Rise to a Claim of the Policy states as follows:

B. If during the Policy Period, the Insureds become aware of a specific Wrongful Act which reasonably may be expected to give rise to a Claim being made against the Insured and give written notice to the Insurer of the specific Wrongful Act, the reasons for anticipating such a Claim, the identities of the potential claimants and the Insureds allegedly responsible for such specific Wrongful Acts, the amount of actual or potential damages, and the circumstances by which the Insureds first became aware of such specific Wrongful Act, then any Claim subsequently made against the Insureds arising out of such specific Wrongful Act, shall be deemed to have been made at the time such notice was received by the Insurer.

II.     Coverage Analysis

Please be advised that Catlin has not made any determination as to the validity of any potential Claims that may arise as a result of this, nor do we assert that any liability exists. Although we lend no credence to such potential Claims, the purpose of this letter is to advise you that Catlin will accept this matter as a Notice of Circumstances which may give rise to a Claim.

Finally, please note that Catlin's continuing investigation of this potential Claim and any further activity taken in regard to this matter are subject to a full reservation of rights under the Catlin Policy, at law and in equity, including, but not limited to, the right to assert at any time that Catlin has no duties to the Insured pursuant to any of the terms and provisions contained in the Policy or under any applicable principles of law or equity.

Catlin's reservation of rights as stated herein is continuing in nature. The steps which have been or may be taken by or on behalf of Catlin to protect its interests are without prejudice to its rights under the terms and provisions of the Policy and at law. No act of any agent, servant or employee of Catlin, including its attorneys, shall be deemed to constitute a waiver or estoppel with respect to such rights. It is also agreed that the Insureds reserve all of their rights under the Policy as well.

Please do not hesitate to contact me if you have any questions or concerns regarding this correspondence.

Sincerely,

Inna Kogan, Esq.
Senior Claims Examiner

**EXHIBIT H**

**FAC SEPTEMBER 13, 2011 LETTER**

[attached]

21

# BARNES&THORNBURG LLP

FILED

2012 MAR -7 PM 12: 29

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

Cm......D.C. & M

James J. Leonard
...........

September 13, 2011

<u>**Via E-mail at: Inna.Kogan@catlin.com**</u>

Inna Kogan, Esq.
Senior Claims Examiner
Catlin, Inc.

|  | | |
|---|---|---|
| Re: | Insured: | First Acceptance Insurance Corporation |
|  | Policy No.: | ICP-91968-0710 |
|  | Your Claim No.: | 102817 |

Dear Ms. Kogan:

This is to provide you and Catlin with additional information regarding the above claim in advance of our scheduled telephone call this afternoon at 3:30 Eastern time.

Following the unsuccessful mediation of this case, plaintiff's counsel has stated that First Acceptance Insurance Corporation's ("First Acceptance") $1,000,000 SIR should be made available in order to continue settlement negotiations. At this point, First Acceptance has not done so. Your Insured seeks Catlin's advisement and direction with regard to the future handling of settlement negotiations in this case.

Plaintiff's $20,500,000 demand on behalf of all claimants ($14,000,000 on behalf of Justin Pittman; $6,000,000 on behalf of Chelsea Pittman; and, $500,000 on behalf of Wendy Pittman, their mother), is a reflection of the severe damages sustained by Justin Pittman and, to a lesser extent, Chelsea Pittman. The extent of the Pittmans' physical and mental damages do not appear to be seriously in question. Justin Pittman was in a coma for a period of time and underwent surgery to relieve pressure on his brain. Ultimately, he underwent a partial lobotomy as a result of this accident and was hospitalized for months. According to plaintiff's counsel, Justin Pittman is in need of 24-hour attendant care and is described as impulsive and very difficult to manage. His unreduced future economic damages are said to be in the range of $60,000,000. Even when reduced to present value, defense counsel indicates that the future economic damages alone could total as much as $15,000,000 for Mr. Pittman.

The traumatic brain injury suffered by Chelsea Pittman was described as less severe and as being in the moderate range. She is said to have had difficulty maintaining gainful employment since the accident and, consistent with her traumatic brain injury, has experienced a loss of sexual inhibition resulting in the birth of two children out of wedlock since this accident. (Chelsea Pittman was 15 at the time of the accident).

In short, the two Pittman children sustained demonstrable severe to moderate brain injuries as a result of this accident with the resulting potential for a concomitantly large verdict.

With respect to the underlying liability case, this matter poses a classic "red light/green light" issue. There are conflicting reports as to whether Joshua Minson (the insured driver) ran a red light during the course of an alleged chase, thereby causing the accident. Joshua indicates that the light was green when he turned and other witnesses have given conflicting testimony as to whether or not the light for Mr. Minson was green or red. The driver of one uninvolved vehicle testified that Mr. Minson had a green light at the time of the accident. However, First Acceptance's defense counsel notes that this same individual apparently gave a statement in which she provided a conflicting statement indicating that Mr. Minson turned against a red light. There are allegations that Mr. Minson was involved in a chase shortly before the subject accident, which tends to support a conclusion that he may in fact have turned against the red light in order to escape his pursuer. The liability case will boil down to this one single issue, which can apparently go either way based on the testimony of the witnesses.

First Acceptance needs to confirm Catlin's coverage position with respect to this matter, both with respect to a potential joint defense agreement as well as with respect to further settlement negotiations. In our view, the *Pittman v. Minson* matter falls within the Catlin coverage, and constitutes one "claim" under the Policy thereby triggering one SIR and one Policy limit. First Acceptance also needs to know what additional information Catlin will require in order to further assess this claim. We will provide as much of that information directly to Catlin as possible, with additional information coming from our defense counsel (assuming that there is no conflict).

As you can see from the foregoing, the potential damages in this case, if lost, are catastrophic and would far exceed First Acceptance's insurance coverage. We have been advised by defense counsel that his estimate for the settlement range for all claims is in the $3,000,000 - $5,000,000 range, which would only implicate the SIR and Catlin's layer of coverage.

We look forward to working with you and Catlin as we proceed with this case.

Sincerely yours,

James J. Leonard

JJL:jkt

ATDS01 JLEONARD 164323v1

# EXHIBIT I

## TYNDALL OCTOBER 31, 2011 E-MAIL

[attached]

743321.1

FILED

2012 MAR -7 PM 12: 29

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

_____ $\mathcal{E}$...D.C. & M

**From:** Jessica C. Tyndall [mailto:jessica@brownlawllp.com]
**Sent:** Monday, October 31, 2011 1:54 PM
**To:** Mark Reineke
**Cc:** Rick Oliveira; jim.leonard@btlaw.com; Gregory W. Brown
**Subject:** First Acceptance - Pittman/Catlin Claim # NYU-PL-114906

Dear Mark,

Attached please find a reservation of rights letter pertaining to the Pittman matter.

As you will note from the letter, Catlin has determined that the matter should be treated as a Claim going forward. To effectively associate with First Acceptance and to be prepared for future settlement negotiations, Catlin respectfully requests that First Acceptance provide us with the following materials:

(1) First Acceptance's claim file for the underlying automobile liability claim
(2) All assessments/reports of First Acceptance's liability for bad faith from First Acceptance's bad faith defense counsel, Joseph Kissane
(3) All assessments/reports from the Minsons' defense counsel to the extent those assessments/reports are not part of the underlying claims file
(4) Copies of any settlement demands or pleadings and/or discovery responses containing the amounts sought by the Pittmans

Please let me know if First Acceptance has any problem providing these materials to us or if you have any questions about the scope of these requests. Please understand that in requesting these materials, Catlin does not intend to waive and of the provisions of the Policy or to modify the coverage position set forth in the attached letter.

I look forward to continuing to work with you on this matter and remain,

Cordially,

Jessica C. Tyndall
brown.
4130 Parklake Avenue, Suite 130
Raleigh, North Carolina 27612
919.719.0856 (direct)
919.719.0854 (main)
919.522.3769 (cell)

**EXHIBIT J**

**CATLIN OCTOBER 31, 2011 LETTER**

**[attached]**

23

743321.1

jessica c. tyndall
919.719.0856
jessica@brownlawllp.com

FILED
2012 MAR -7 PM 12: 29

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

$\mathcal{E}_{\widehat{M}}$ ...C.C. & M

October 31, 2010

**via electronic and first class mail,**

Mark P. Reineke
Vice President Legal Affairs
First Acceptance Corporation
3322 West End Avenue – Suite 1000
Nashville, Tennessee 37203

re:             **Reservation of Rights**
matter:         *Pittman, et. al. v. Minson*, Columbia County, Florida Civil Action No. 08-108CA
insurer:        Catlin Insurance Company (UK), Ltd. ("Catlin")
policy #:       ICP-91968-0710 (the "Policy")
policy period:  7/1/2010-7/1/2011
policy limit:   $5,000,000
retention:      $1,000,000
claim #:        NYU-PL-114906

Dear Mr. Reineke:

As you know, this law firm represents Catlin in connection with insurance coverage issues arising out of the above-referenced matter. On behalf of Catlin, we once again acknowledge receipt of James Leonard's September 13, 2011 letter requesting that Catlin treat this matter as a Claim.[1] We also acknowledge and thank you for the additional information you have provided regarding this matter, including giving our firm the opportunity to discuss this case with First Acceptance's bad faith defense counsel, Joseph Kissane.

Based on the information we have received from you and from Mr. Kissane, Catlin has determined that this matter constitutes a Claim under the Policy, and Catlin intends to treat it as such going forward. We note that Catlin has not made any determination as to the truth or falsity of the allegations made by the Pittmans against First Acceptance, and in providing you with this correspondence, neither Catlin nor we intend to imply that the Pittmans' claims have any merit. Instead, the purpose of this letter is to draw your attention to several provisions within the Policy that may affect Catlin's coverage of this matter.

At present, we understand that the Pittmans contend that First Acceptance failed to properly initiate settlement negotiations and failed to properly settle their claims against First Acceptance's insureds, James and Joshua Minson. We understand that at an August 2011 mediation, the Pittmans made a $20,500,000 settlement demand that was premised upon First Acceptance's alleged liability for bad faith in its handling of the Pittmans' claim against the Minsons.

We direct your attention to the Policy's Insuring Agreement, which provides that Catlin "shall pay, on behalf of the Insured, Loss arising from any Claim by a policyholder or third party client first made against the Insured during the Policy period . . . for a Wrongful Act in the rendering of or failure to render Professional Services to the claimant." Although "Claim" is defined by the Policy as a "written demand for monetary or non-monetary relief," based on the circumstances surrounding the Pittman's lawsuit against First Acceptance's insureds, their demand at the recent mediation, and their continued allegations that First

---

[1]    In capitalizing the term Claim, we intend to refer you to and incorporate by reference the definition of that term in the Policy.



4130 parklake avenue, suite 130, raleigh, north carolina 27612 | tel 919.719.0035 | fax 919.719.0358 | brownlawllp.com

Acceptance erred in its claims handling, Catlin has concluded that it is proper to treat this matter as a Claim at this juncture.

We note that the underlying automobile accident occurred in 2007, and the Pittmans filed their lawsuit against the Minsons in February 2008. Though we understand from you that the Pittmans did not make a specific written demand for monetary or non-monetary relief against First Acceptance between the date of the accident and the date on which First Acceptance tendered this matter to Catlin for coverage, because the Policy is a "claims made and reported" policy, we must respectfully reserve Catlin's rights to decline coverage or to limit coverage for this matter in the event it becomes apparent that a written demand was made against First Acceptance prior to the inception of the Policy.

We also direct your attention to the Policy's Exclusions, and in particular, Exclusion Q, which provides that the "Policy provides no coverage in connection with any Loss arising from any Claim for any liability contractually assumed by the Insureds under any policy . . . of insurance." Accordingly, there is no coverage for amounts First Acceptance is contractually obligated to pay the Pittmans by virtue of its insurance contract with the Minsons.

As you know, First Acceptance, and not Catlin, has the duty to defend any Claim made against First Acceptance. First Acceptance has chosen Joseph Kissane of the Cole, Scott & Kissane law firm to protect its interests in connection with the Pittmans' allegations. Catlin reserves its right to "effectively associate in the defense and the negotiation of any settlement" as is permitted under Section V, paragraph G of the Policy. Pursuant to that same Policy section and paragraph First Acceptance "shall not admit or assume any liability, make any settlement offer, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior consent of [Catlin.]"

The Policy's Aggregate Limit of Liability for all Claims reported during the Policy Period is $5,000,000, and that limit is reduced by Catlin's payment of Defense Costs. See Policy, Section IV, Paragraphs A & C. In addition to the Pittman matter discussed in this correspondence, First Acceptance has reported to Catlin a Claim involving a lawsuit styled *Hyun N. An as guardian of Jina Hong, et. al. v. Estate of Ronald Jackson*, Dekalb County, Georgia, Case Number 09A10141. The Hynan matter and the Pittman matter are subject to the Policy's single aggregate limit of liability. Accordingly, amounts paid by Catlin in defense and/or in settlement of the Pittman matter will serve to erode and possibly eliminate amounts available to defend and/or settle the Hynan matter.

Catlin shall only be liable for that part of covered Loss that is in excess of First Acceptance's $1,000,000 Retention. Policy, Section IV, Paragraph B. Finally, we note that the Policy provides that Catlin is entitled to seek reimbursement of any amounts in pays in connection with this matter if it becomes apparent that this matter is not covered under the Policy. Policy, Section V, Paragraph F.

Please understand that Catlin's decision to treat this matter as a Claim is based upon its review of the particular circumstances surrounding this matter only. Catlin does not intend to waive its right to strictly interpret any provision of the Policy in connection with any other claim or potential claim tendered for coverage by First Acceptance. Additionally, this correspondence is not intended to be an exhaustive list of all of the Policy's terms or all of the possible terms that may affect coverage for this matter. In that regard, we must respectfully reserve Catlin's right to limit or preclude coverage based on policy provisions or applicable legal principles that are not specifically set forth within this letter. To the extent Catlin becomes aware of other matters and provisions that may affect coverage for this matter, however, Catlin will endeavor to provide First Acceptance with prompt notice of the same.

Going forward, we ask that you provide Catlin and our firm with a copy of any and all status reports and/or assessments of the underlying automobile liability lawsuit filed by the Pittmans as well as the reports and/or assessments of the Pittmans' claims against First Acceptance so that Catlin can effectively associate

with First Acceptance regarding the defense and potential resolution of this matter. We look forward to our continued work with you and remain,

Cordially,

Jessica C. Tyndall

cc:     Rick Oliveira (via electronic mail only)
        James Leonard (via electronic mail only)

## EXHIBIT K

## TYNDALL JANUARY 17, 2012 LETTER

**[attached]**

24

743321.1

jessica c. tyndall
919.719.0856
jtyndall@brownlawllp.com

January 17, 2012

via electronic and first class mail

| | |
|---|---|
| Mark P. Reineke | James J. Leonard |
| Vice President Legal Affairs | Barnes & Thornburg, LLP |
| First Acceptance Corporation | Prominence in Buckhead – Suite 1700 |
| 3322 West End Avenue – Suite 1000 | 3475 Piedmont Road, N.E. |
| Nashville, Tennessee 37203 | Atlanta, Georgia 30305-2954 |

re:         denial of coverage.
matter:     Pittman, et. al. v. Minson, Columbia County, Florida Civil Action No. 08-108CA
insurer:    Catlin Insurance Company (UK), Ltd. ("Catlin")
policy #:   ICP-91968-0710 (the "Policy")
policy period: 7/1/2010-7/1/2011
policy limit: $5,000,000
retention:  $1,000,000
claim #:    NYU-PL-114906

Dear Messrs. Reineke and Leonard:

        We write on behalf of Catlin to formally respond to your January 10th, January 13th, and January 17th letters and to update Catlin's coverage position regarding this matter.

        After careful review of your letters and the materials provided to us by First Acceptance, including the claim file and the recently provided January 29 and January 30, 2008 letters from Toral Garcia Pinyero & Franz, P.A. to Marshall Dennehy Warner Coleman & Goggin, P.C., Catlin has concluded that the Policy does not afford coverage for this matter.

        As you know, the Policy is a "claims made and reported" policy. Thus, the Policy requires that any Claim be "first made" against First Acceptance during the Policy Period in order to trigger Catlin's coverage obligations. Here, we note that the Pittmans made a Claim against First Acceptance on January 29, 2008 and January 30, 2008, and as a result, there is no coverage under the Policy for this matter.

        We draw your attention to the Policy, which defines the term "Claim" in pertinent part as "a written demand for monetary or non-monetary relief made upon an Insured." We next direct you to the Toral Garcia letters, which clearly indicate that as a result of First Acceptance's failure to tender its Policy limits to the Pittmans in September 2007, the Pittmans notified First Acceptance of their intent to seek an "excess verdict" against First Acceptance's insureds and, based on the case law cited by the Pittmans' counsel, to pursue First Acceptance for that excess judgment. Regrettably, the only reasonable interpretation of these letters is that the Pittmans made a written demand in January 2008, notifying First Acceptance that they intended to seek monetary relief – in the form of an excess verdict against First Acceptance's insureds – from First Acceptance as a result of First Acceptance's alleged bad faith. The January 2008 Toral Garcia letters constitute a Claim against First Acceptance, and because that Claim was first made against First Acceptance prior to the inception of the Policy Period, the Policy does not afford coverage for this matter.

        Your letters inaccurately contend that Catlin's has attempted to "ignore" this matter and has taken a "shifting sands" approach to its coverage position. The facts and circumstances surrounding Catlin's response to this matter, however, demonstrate otherwise.

**brown.**

Case 3:12-cv-00484   Document 1-4   Filed 05/16/12   Page 80 of 104 PageID #: 484

We note that since First Acceptance reported this matter in June 2011 and continuing through Mr. Leonard's January 10th letter, First Acceptance has taken the position that the Pittmans' allegations against First Acceptance have not yet become a Claim. In fact, despite apparently having the January 2008 Toral Garcia letters in its possession and having access to them long ago, First Acceptance adamantly denied that the Pittmans had ever made any written demands against First Acceptance.

Although First Acceptance contended that no Claim had been made, First Acceptance nevertheless urged Catlin to treat this matter as a Claim as a potential means of reducing exposure should the Pittmans sue First Acceptance following a potential excess verdict against the Minsons. Having no obligation to do so, Catlin – as an accommodation to First Acceptance – acquiesced to First Acceptance's request in October 2011. At that time, though, Catlin specifically and clearly expressed concern about the fact that underlying automobile accident occurred in 2007 and about the fact that First Acceptance's allegedly improper claims handling occurred in late 2007 and early 2008.

To be sure, in the October 31, 2011 reservation of rights letter transmitted to First Acceptance by our firm, we stated:

> We note that the underlying automobile accident occurred in 2007, and the Pittmans filed their lawsuit against the Minsons in February 2008. Though we understand from you that the Pittmans did not make a specific written demand for monetary or non-monetary relief against First Acceptance between the date of the accident and the date on which First Acceptance tendered this matter to Catlin for coverage, because the Policy is a "claims made and reported" policy, we must respectfully reserve Catlin's rights to decline coverage or to limit coverage for this matter in the event it becomes apparent that a written demand was made against First Acceptance prior to the inception of the Policy.

Catlin's approach to this matter, therefore, could not be more consistent. The concerns expressed in Catlin's initial reservation of its rights regarding this matter were borne out.

Similarly, Catlin has timely and painstakingly reviewed every shred of information provided to it by First Acceptance. In that connection, both Catlin's representatives and our firm have participated in countless conference calls regarding the facts surrounding and exposures presented by the underlying lawsuit against the Minsons. Catlin even encouraged First Acceptance to authorize the Minsons' defense counsel to participate in the December 14, 2011 focus studies and agreed to permit First Acceptance to erode its self-insured retention with a portion of the costs associated with those studies. Thus, the suggestion that Catlin has ignored anything about this matter is simply incorrect and not supported by the course of actual events.

We regret that the Policy does not afford coverage for this matter and that Catlin has only recently been able to conclusively make this determination based upon the information First Acceptance provided to it last week. However, it appears that First Acceptance was well aware of the Pittmans' Claim years ago, and we respectfully suggest that Catlin's coverage determination could have been made sooner had First Acceptance been more forthcoming during the underwriting process and in its reporting obligations.

In closing, we note that Catlin does not intend to waive any of its rights under the Policy or applicable law and expressly retains the right to decline to cover this matter based on policy provisions and legal principals that are not expressly set forth in this correspondence or the prior correspondence we and Catlin have exchanged with First Acceptance relating to this matter. Should either of your feel there is more to discuss, please direct all such inquiries and correspondence to our firm.

2

We remain,

Cordially,

Gregory W. Brown
Jessica C. Tyndall

cc (via electronic mail only):    R. Oliveira
G. Hansen

3

**COLLECTIVE EXHIBIT L**

**GARCIA LETTERS**

**[attached]**

25

743321.1

FILED

2012 MAR -7 PM 12

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

$Ex$ J.D.C. & H

# TORAL GARCIA PINEYRO & FRANZ P.A.
### ATTORNEYS AT LAW

Frank L. Toral

Alejandro M. Garcia

Johnny A. Pineyro

William M. Franz

Broward (954) 703-2960

Dade (305) 933-3178

Toll Free (877) 867-2552

Fax (954) 703-2976

www.torallaw.com

**Via Facsimile (904) 355-0019**

January 29, 2008

Tashia M. Small, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
200 West Forsyth Street, Suite 1400
Jacksonville, FL  32202

RE:     Our Clients:      **Justin and Chelsea Pittman, minors**
        Insured:          **Minson**
        Claim No.:        **90710305**
        Date of Loss:     **8/12/2007**
        File No.:         **06 016.00125**

Dear Ms. Small:

Pursuant to our conversation, please be advised that we will not be attending the global settlement conference scheduled for tomorrow January 30, 2008. We feel that 1st Acceptance had ample time to investigate this case and failed to tender the policy limits to our above captioned clients pursuant to our demand of September 18, 2007. Further be advised that we will be looking for an excess verdict in these cases.

If you have any questions please do not hesitate to contact the undersigned.

Sincerely,

ALEJANDRO M. GARCIA
AMG/dms

Toral Professional Building, 4780 Davie Road, Suite 101, Fort Lauderdale, Florida 33314

# TORAL GARCIA PINEYRO & FRANZ P.A.
### ATTORNEYS AT LAW

Frank L. Toral

Alejandro M. Garcia

Johnny A. Pineyro

William M. Franz

Broward (954) 703-2960

Dade (305) 893-3178

Toll Free (877) 867-2552

Fax (954) 703-2976

www.torallaw.com

**Via Facsimile (904) 355-0019**

January 30, 2008

Michael Orr, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
200 West Forsyth Street, Suite 1400
Jacksonville, FL  32202

RE:      Our Clients:      **Justin and Chelsea Pittman, minors**
         Insured:          **Minson**
         Claim No.:        **90710305**
         Date of Loss:     **8/12/2007**
         File No.:         **06 016.00125**

Dear Mr. Orr:

Pursuant to your request, please see the following case law:

- Farinas v. Florida Farm Bureau General Ins. Co.: 850 So.2d 555
- General Security National Ins. Co. v. Marsh: 303 F.Supp. 1321

If you have any questions, do not hesitate to contact me.

Sincerely,

ALEJANDRO M. GARCIA
AMG/dms

Toral Professional Building, 4780 Davie Road, Suite 101, Fort Lauderdale, Florida 33314

**EXHIBIT M**

**FAC JANUARY 23, 2012 LETTER**

**[attached]**

26

743321.1

# BARNES&THORNBURG LLP

**James J. Leonard**
(404) 264-4060
jim.leonard@btlaw.com

FILED

2012 MAR -7 PM 12: 30

CLERK & MASTER
DAVIDSON CO. CHANCERY CT

January 23, 2012

.......C. C. & M

Prominence in Buckhead
Suite 1700
3475 Piedmont Road N.E.
Atlanta, GA 30305-2954 U.S.A.
(404) 846-1693
Fax (404) 264-4033

www.btlaw.com

**VIA E-MAIL: JESSICA@BROWNLAWLLP.COM**

Jessica C. Tyndall, Esq.
Brown Law LLP
4130 Parklake Avenue, Suite 130
Raleigh, NC 27612

Re:  Matter:        Pittman, et al. v. Minson
     Policy No.:     ICP-91968-0710
     Claim No.:      102817

Dear Jessica:

This is to respond to your January 17, 2012 correspondence regarding the above claim.

After reviewing your letter, we are at a complete loss as to the basis for your conclusion that no coverage exists under the Catlin policy for the Pittman claim. We are in fact astounded by Catlin's complete lack of good faith in its management of this file from the beginning, which in hind sight, shows a complete lack of consistent or reasonable approach with this insured, First Acceptance ("FAC").

Catlin's position is based on an unsupportable reading of its own policy with respect to the meaning of "written demand for monetary or non-monetary relief made upon an Insured." While you refer generally to the Toral Garcia letters and the plaintiffs' general "intent" to seek an excess verdict against FAC's insureds, such statement of intent does not qualify as a "written demand for monetary or non-monetary relief." Is it your suggestion that the plaintiffs' statement of an intent to obtain an excess verdict against one of FAC's insureds constitute some sort of a written demand on FAC? What is the relief (either monetary or non-monetary) which the plaintiffs are demanding from FAC? These are rhetorical questions as it is clear that no such "demand" is being made on FAC. None of the letters referenced, nor any correspondence from the plaintiffs' counsel at any time demands a specific amount of monetary relief (or non-monetary relief) from FAC. While you indicate that: "regrettably, the only reasonable interpretation of these letters is that the Pittmans made a written demand in January 2008, notifying First Acceptance that they intended to seek monetary relief in the form of an excess verdict" does not constitute a "written demand for monetary relief." Based on the language in your own letter, it's clear that the letters expressed merely an "intent" to obtain an excess verdict against FAC's insureds. Catlin's position in this regard, as expressed in your January 17, 2012 letter, is completely groundless and is the basis for a bad-faith claim against Catlin for its denial

of coverage in this case. *Johnson v. Tennessee Farmers Mutual Insurance Co.*, 205 S.W.3d 365 (Tenn. 2006).

With respect to whether a "written demand for monetary relief" was submitted, we direct your attention to *Warren v. Federal Insurance Co.* 358 Fed. Appx. 670, 2009 WL 4927968 (C.A.6 (Ohio)), interpreting the precise language at issue in this case. In the *Warren* case, the Sixth Circuit reviewed the plaintiff's claim that a "written demand for monetary" damages was made under it's D&O policy form. In that case, the letter indicated that the plaintiffs believed that the Warrens were responsible for misrepresentations regarding Prime's inventory which affected the borrowing base certificates and Prime's financial statements upon which PNC relied. The letter further stated that: "We are currently evaluating PNC's rights and remedies with respect to these misrepresentations." (*Warren Supra*, 358 Fed. Appx. 670, 674.) The Sixth Circuit concluded that a claimant who was "currently evaluating" its rights and "making a claim for monetary damages" are "mutually exclusive." Indeed, as in this case, a claimant who indicates that FAC has acted in bad faith and therefore it will seek an excess judgment against its driver insured provides no "written demand for monetary relief" – indeed there is no relief of any kind demanded. It is merely a statement of intent, as in the *Warren* decision above.

Under Tennessee law, it is well established that a court's initial task in construing an insurance contract is to determine whether the language of the contract is in any way ambiguous. While language that is susceptible to more than one reasonable interpretation is ambiguous and should be construed in favor of the insured, courts should not favor either party if the policy's language is unambiguous and free from doubt and should enforce unambiguous policies as written. *See, e.g., Spears v. Tennessee Farmers Mutual Insurance Co.*, 300 S.W.3d. 671 (Tenn. App. 2009). In our view, the policy's language is not ambiguous, but clearly requires a "written demand" for some form of "monetary relief" or "non-monetary relief." You have not identified the specific "relief" which is "demanded" by any of the correspondence forwarded by the plaintiffs. Your statement that there is only "one reasonable interpretation" of those letters is, in our view, evidence of bad faith and is not even a reasonable alternative interpretation of the letters. As you have not been able to cite the relief demanded from FAC, no claim was made earlier which would trigger the exclusions cited in your letter with respect to a Notice of Claim under an earlier policy period.

Pursuant to Tennessee law, FAC demands that Catlin accept the Pittman claim for coverage and immediately reverse its position with respect to its denial (as set forth in your January 17, 2012 letter). Catlin's failure to do so within the time required by law will expose Catlin to bad-faith penalties as well as any other remedy available at law or in equity.

Finally, in light of Catlin's crownless and bad-faith denial of coverage in this matter, FAC will act as a reasonable insured in further managing the Pittman claim and will either defend or settle the claim as it deems reasonable and will hold Catlin responsible for payment of the loss according to the applicable law. FAC continues to reserve all of its rights and remedies under the policy and at law generally. In light of Catlin's outright denial of coverage, there is no longer any mutuality of interest which would permit FAC to share information with Catlin on a

BARNES&THORNBURG LLP

privileged basis with respect to the Pittman claim. FAC demands that Catlin keep all materials forwarded to it previously as confidential work product and maintain that confidentiality until otherwise advised. If Catlin will not agree to do so, you must advise me immediately so that we may seek an appropriate protective order with respect to the documents shared, in good faith, with Catlin while Catlin operated under a reservation of rights with FAC.

     Govern yourselves accordingly.

            Very truly yours,

            James J. Leonard

JJL/dah

cc:    Mr. Rick Oliveira
       Mr. Mark Reineke
       Mr. Scott Walker
       Mr. Dan Walker
       Mr. Joe Kissane

ATDS01 171084v1

BARNES&THORNBURG LLP

# EXHIBIT N

## TYNDALL JANUARY 27, 2012 LETTER

[attached]

27

743321.1

jessica c. tyndall
919.719.0856
jica@brownlawllp.com

**FILED**

2012 MAR -7 PM 12: 30

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

January 27, 2012

via electronic and first class mail,

| Mark P. Reineke | James J. Leonard |
|---|---|
| Vice President Legal Affairs | Barnes & Thornburg, LLP |
| First Acceptance Corporation | Prominence in Buckhead – Suite 1700 |
| 3322 West End Avenue – Suite 1000 | 3475 Piedmont Road, N.E. |
| Nashville, Tennessee 37203 | Atlanta, Georgia 30305-2954 |

re:            **Pittman, et. al. v. Minson, Columbia County, Florida Civil Action No. 08-108CA**
insurer:       Catlin Insurance Company (UK), Ltd. ("Catlin")
policy #:      ICP-91968-0710 (the "Policy")
policy period: 7/1/2010-7/1/2011
policy limit:  $5,000,000
retention:     $1,000,000
claim #:       NYU-PL-114906

Dear Messrs. Reineke and Leonard,

We are in receipt of Mr. Leonard's January 23, 2012 letter requesting that Catlin reconsider its decision to disclaim coverage for the above-referenced claim. While in the process of responding to Mr. Pittman's letter today, we received a telephone call from Mr. Reineke advising us of a "potential" opportunity to resolve the *Pittman* litigation for an amount approximating $3,000,000. We subsequently received an email from Mr. Reineke demanding that Catlin reconsider its coverage position and participate in settlement negotiations. On behalf of Catlin, please allow us to respond.

Regarding Mr. Leonard's letter, let us first note that, Catlin's willingness to review additional materials, arguments and legal authority should not be construed as a waiver, modification or limitation of any of Catlin's rights under the Policy or applicable law. To be sure, Catlin continues to reserve all of its rights and remedies to the maximum extent permitted by law.

Catlin has carefully considered the arguments made in Mr. Leonard's correspondence. We note that Catlin was aware of the legal authority cited in that letter prior to disclaiming coverage for this matter, and Catlin has reviewed those cases again at your request. Having thoroughly evaluated its coverage position, Catlin has determined that its decision to disclaim coverage for this matter was sound and supported by the facts and applicable law. This matter does not constitute a Claim that was first made within the Policy Period, and as a result, there is no available coverage under the Policy.

Regarding Mr. Reineke's telephone call and email, we have confirmed that the Pittmans have not demanded $3,000,000 to settle their lawsuit or their bad faith claims against First Acceptance. Indeed, Mr. Reineke told us specifically that "no demand has been made" in the last few weeks. Instead, it has only been vaguely intimated in conversations among counsel that the Pittmans *might* be willing to accept an amount *approximating* $3,000,000 to settle their claims. We further understand that there have been no assurances that the Pittmans *will* accept $3,000,000 if such an offer is tendered to them. Accordingly, notwithstanding Catlin's coverage position, which remains unchanged, there does not appear to be a demand to which Catlin can or must respond.

Despite the absence of a concrete intention to resolve this matter by the Pittmans, First Acceptance has advised Catlin that it believes it can resolve the Pittmans' lawsuit for $3,000,000 or less and that doing so

**brown.**

would be a reasonable settlement of the Pittmans' claims. Catlin encourages First Acceptance to act reasonably and reserves its right to contest the reasonableness of any settlement in amount exceeding $3,000,000.

Please be advised that Catlin expressly retains the right to decline to cover this matter based on policy provisions and legal principals that are not expressly set forth in this correspondence or the prior correspondence we and Catlin have exchanged with First Acceptance relating to this matter. Should you feel there is more to discuss, please do not hesitate to contact us.

We remain,

Cordially,

Gregory W. Brown
Jessica C. Tyndall

cc:   Rick Oliveira (via electronic mail only)
      XL Insurance c/o Bill Smith, Wiley Rein, LLP (via electronic mail only)
      Dereik Wood/Chartis Insurance (via electronic mail onl)

2

**EXHIBIT O**

**FAC FEBRUARY 7, 2012 LETTER**

[attached]

28

743321.1

# BARNES&THORNBURG LLP

James J. Leonard
(404) 264-4060
jim.leonard@btlaw.com

FILED

Prominence in Buckhead
Suite 1700
3475 Piedmont Road N.E.
Atlanta, GA 30305-2954 U.S.A.
(404) 846-1693
Fax (404) 264-4033
www.btlaw.com

2012 MAR -7 PM 12: 30

CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

B.C.& M

February 7, 2012

**VIA E-MAIL: JESSICA@BROWNLAWLLP.COM**

Jessica C. Tyndall, Esq.
Brown Law LLP
4130 Parklake Avenue, Suite 130
Raleigh, NC 27612

      Re:    First Acceptance Corporation
            Policy No.:      ICP-91968-0710
            Catlin Claim No.:  NYU-PL-114906
            Civil Action:    *Pittman, et al v. Minson, Columbia County, Fl.:*
                            *Civil Action No. 08-108-CA*

Dear Ms. Tyndall:

    This will respond to your January 27, 2012 correspondence regarding the above matter. We have reviewed all of the correspondence between the parties hereto dating back to the June 7, 2011 notice letter which was sent to Catlin via Lockton Insurance Brokers LLC. Having carefully reviewed the facts and the applicable law, we have concluded that it is abundantly clear that Catlin is acting in bad faith with respect to insured First Acceptance Corporation, and that our client intends to hold Catlin responsible for all damages and penalties available under the law for Catlin's unreasonable, improper and bad-faith claim techniques which you and Catlin have utilized in the management of this claim and Catlin's ultimate denial of coverage.

    From the time this matter was first reported to Catlin as a "Notice of Circumstances" on June 7, 2011, Catlin has shifted its coverage position repeatedly in an effort to wrongfully deny coverage for this matter. Upon initial receipt of the Notice of Circumstances, Catlin's Inna Kogan first took the position with First Acceptance that Notices of Circumstances were required to be reported to Catlin under the terms of the policy. Of course, this position was meritless, and was initially advanced by Ms. Kogan with an apparent intent to improperly limit coverage for the Pittman matter. Once we directed Ms. Kogan to the language of her own company's insurance policy issued to First Acceptance, as well as the previous discussions which your firm and I had, Ms. Kogan recanted her position by email dated July 27, 2011. As of that date, Catlin agreed to accept the Pittman matter as a Notice of Circumstances. The obvious reason for that was that no "written demand for monetary relief" had been made against First Acceptance as of that date. Ms. Kogan had the May 6, 2011 written demand upon the driver insured, and it was clear that Ms. Kogan did not consider that demand sufficient to trigger a "Claim" under the policy.

As the underlying Pittman claim proceeded toward mediation and a trial date, First Acceptance requested Catlin to become involved in the claim process and to formally consider the Pittman matter as a "Claim" (rather than simply a Notice of Circumstances) under the policy. By my letter dated September 13, 2011 to Ms. Kogan, First Acceptance requested Catlin become directly involved in further settlement negotiations regarding the Pittman matter, and "to confirm Catlin's coverage position with respect to this matter...." On October 31, 2011, you advised Mr. Reineke by email correspondence that "Catlin has determined that the matter should be treated as a Claim going forward" and requested a substantial amount of information from First Acceptance. Your October 31, 2011 letter (although it is dated October 31, 2010) acknowledged that: "Although "Claim" is defined by the Policy as a "written demand for monetary or non-monetary relief," based on the circumstances surrounding the Pittman's lawsuit against First Acceptance's insureds, their demand at the recent mediation, and their continued allegations that First Acceptance erred in its claims handling, Catlin has concluded that it is proper to treat this matter as a Claim at this juncture."

Thereafter, First Acceptance provided Catlin with its claim file and related documents for its review. First Acceptance involved Catlin in all settlement discussions in the Pittman matter, and repeatedly requested Catlin's active participation in the settlement process and mediation. Catlin, through your offices, repeatedly stopped and started its commitment to a mediation, and did not even provide First Acceptance with authorization to offer its $1 million self-insured retention until January 11, 2012. At that point, Catlin had forced First Acceptance into a position of squandering any mid-January mediation opportunity with the Pittman plaintiffs, and Catlin further refused to commit to participate in mediation whatsoever. This "about face" in Catlin's position regarding settlement negotiations and mediation was completely unfounded and appears simply to have been a delaying tactic on Catlin's part in order to stall until it could "create" some reason to deny the Pittman claim.

On January 17, 2012, Catlin, through your offices, denied all coverage for the Pittman matter, contending that the January 29, 2008 and January 30, 2008 letters from Alejandro M. Garcia constituted a "written demand for monetary relief" under the Policy and therefore the Pittman matter did not trigger coverage during the 2010-2011 policy period. These two letters were the only new information provided to Catlin from the October 2011 through January 2012 timeframe. What you and Catlin have failed and refused to answer is the question contained in my January 23, 2012 correspondence: What is the monetary or non-monetary relief which the plaintiffs are "demanding" from First Acceptance in the January 29, 2008 or January 30, 2008 letters? The January 30, 2008 letter merely contains citations to two Florida cases. That letter makes no demand of any kind whatsoever, but is merely informative with regard to case law which Mr. Garcia considered relevant. The January 29, 2008 letter to which you refer as making a "written demand" notifying First Acceptance that they "intended to seek monetary relief in the form of an excess verdict" contains no demand whatsoever against First Acceptance. You and Catlin have refused to identify what it is that Mr. Garcia is demanding from First Acceptance in this letter. Your position is groundless, improper, and is the essence of bad faith. Your January 17, 2012 letter even describes the January 2008 correspondence as expressing an "intention" to seek monetary relief in the form of an excess verdict, which, under any applicable law does not

constitute a "written demand for monetary or non-monetary relief" as required under the policy. The statement that Mr. Garcia will be "looking for an excess verdict in these cases" does not constitute a demand for anything. Neither you nor Catlin have pointed to any amount or non-monetary relief which is being demanded by the Pittman plaintiffs from First Acceptance. They do not demand an excess verdict from First Acceptance. They do not demand any money from First Acceptance. They do not demand that First Acceptance tender its policy limits to their clients. In short, Catlin's coverage position is baseless.

Your January 27, 2012 letter provides no insight or argument to dispute the conclusions set forth in my January 23, 2012 correspondence. Rather, you conclude without any justification or legitimate response to my January 23, 2012 letter that Catlin's decision to disclaim coverage "was sound and supported by the facts and applicable law." While you indicate that you were even aware of the Tennessee and Sixth Circuit law set forth in my January 23, 2012 letter, you make no effort whatsoever to distinguish or address in any manner those cases cited. Again, we view your January 27, 2012 letter as a mere stonewalling tactic which provides no insight or illumination of Catlin's coverage position.

As you now know, the Pittman matter has been resolved for $2.1 million, which will be paid by First Acceptance following the final negotiation of settlement documents and approval of that amount by the court. Your January 27, 2012 letter advises that Catlin reserved its rights to contest reasonableness of any settlement in amount exceeding $3 million. Therefore, we trust that Catlin has no objection and has waived its rights to contest the reasonableness of the $2.1 million settlement amount.

Having reviewed all of the facts, applicable law, and prior correspondence between the parties regarding the Pittman matter, it is abundantly clear that Catlin has no coverage defense to this matter and has acted in bad faith with respect to its insured First Acceptance. Once again, on behalf of my client, this is to demand that Catlin tender $1.1 million to First Acceptance for payment to the Pittman plaintiffs. Your client's failure to do so will result in First Acceptance's enforcement of its rights against Catlin for any and all damages and penalties available under the policy and the applicable law.

Very truly yours,

James J. Leonard

JJL/dah

cc:  Mr. Rick Oliveira
     Mr. Mark Reineke
     Mr. Scott Walker
     Mr. Dan Walker
     Mr. Joe Kissane

ATDS01 171741v1

BARNES&THORNBURG LLP

# ORIGINAL

| STATE OF TENNESSEE<br>20TH JUDICIAL DISTRICT<br>CHANCERY COURT | SUMMONS | CASE FILE NUMBER<br>12-0348 IV |
|---|---|---|

| PLAINTIFF<br>First Acceptance Corporation | DEFENDANT<br>Catlin Insurance Company (UK), Ltd. |
|---|---|

TO: (NAME AND ADDRESS OF DEFENDANT)
Catlin Insurance Company (UK), Ltd.
c/o Steve Adams
3340 Peachtree Road N.E., Suite 2950
Atlanta, GA 30326

Method of Service:  *Comm. Of Insurance

List each defendant on a separate summons.                    *Attach Required Fees

YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

| Attorney for plaintiff or plaintiff if filing Pro Se!<br>Luis C. Bustamante, BPR No. 015328<br>Katherine F. Layman, BPR No. 029165<br>Woolf, McClane, Bright, Allen & Carpenter, PLLC<br>900 South Gay Street, Suite 900<br>P.O. Box 900<br>Knoxville, TN 37901-0900<br>(865) 215-1000 | FILED, ISSUED & ATTESTED<br><br>MAR - 7 2012<br><br>CRISTI SCOTT, Clerk and Master<br>By:          1 Public Square<br>              Suite 308<br>              Nashville, TN 37201<br><br>*Elaine Harper*<br>Deputy Clerk & Master |
|---|---|

## NOTICE OF DISPOSITION DATE

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | Sheriff |

***Submit one original plus one copy for each defendant to be served.

§ADA Coordinator, Cristi Scott (862-5710)

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _Served Communero_

☑ Served _____ MAR 1 2 2012 _____

☐ Not Served _____

☐ Not Found _____

☐ Other _____

DATE OF RETURN: _____ MAR 1 2 2012 _____

By: _____

Sheriff or other authorized person to serve process.

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to the defendant _____. On the _____ day of _____, 20___, I received the return receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

| Sworn to and subscribed before me on this _____ day of _____, 20___. | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. |
|---|---|
| Signature of ____ Notary Public or ____ Deputy Clerk | |
| My Commission Expires: | |

## NOTICE OF PERSONAL PROPERTY EXEMPTION

**TO THE DEFENDANT(S):**

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to: Clerk & Master
1 Public Square
Suite 308
Nashville TN 37201

Please state file number on list.

## CERTIFICATION (IF APPLICABLE)

I, Cristi Scott, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case.

CRISTI SCOTT, Clerk & Master

By: _____

D.C. & M.

# ORIGINAL

| STATE OF TENNESSEE<br>20TH JUDICIAL DISTRICT<br>CHANCERY COURT | SUMMONS | CASE FILE NUMBER<br>12-0348  III |
|---|---|---|
| PLAINTIFF<br>First Acceptance Corporation | | DEFENDANT<br>Catlin Insurance Company (UK), Ltd. |

TO:  (NAME AND ADDRESS OF DEFENDANT)
Catlin Insurance Company (UK), Ltd.
c/o Gardere, Wynne, Sewell, LLP
600 Congress Avenue, Suite 3000
Austin, TX 78701

Method of Service:  *Comm. Of Insurance

List each defendant on a separate summons.                                          *Attach Required Fees

---

YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

---

| Attorney for plaintiff or plaintiff if filing Pro Se:<br>Luis C. Bustamante, BPR No. 015328<br>Katherine F. Layman, BPR No. 029165<br>Woolf, McClane, Bright, Allen & Carpenter, PLLC<br>900 South Gay Street, Suite 900<br>P.O. Box 900<br>Knoxville, TN 37901-0900<br>(865) 215-1000 | FILED, ISSUED & ATTESTED<br><br>**MAR - 7 2012**<br><br>CRISTI SCOTT, Clerk and Master<br>By:                    1 Public Square<br>                         Suite 308<br>                         Nashville, TN 37201<br><br>*Elaine Harper*<br>Deputy Clerk & Master |

## NOTICE OF DISPOSITION DATE

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | |
| | Sheriff |

***Submit one original plus one copy for each defendant to be served.

ᵻADA Coordinator, Cristi Scott (862-5710)

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _Served Commissioner Thomas_ [handwritten]

☑ Served _MAR 1 2 2012_

☐ Not Served _____

☐ Not Found _____

☐ Other _____

DATE OF RETURN:

_MAR 1 2 2012_

By: _Timothy Carroll Special Officer_ [handwritten]

Sheriff or other authorized person to serve process

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to the defendant _____. On the _____ day of _____, 20___, I received the return receipt, which had been signed by _____ on the _____ day of _____, 20___. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

| Sworn to and subscribed before me on this _____ day of _____ , 20___. Signature of _____ Notary Public or _____ Deputy Clerk | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. |
|---|---|
| My Commission Expires: | |

## NOTICE OF PERSONAL
## PROPERTY EXEMPTION

TO THE DEFENDANT(S):

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to:  Clerk & Master
1 Public Square
Suite 308
Nashville TN 37201

Please state file number on list.

## CERTIFICATION (IF APPLICABLE)

I, Cristi Scott, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case.

CRISTI SCOTT, Clerk & Master

By:

D.C. & M.

COPY

SCANNED

IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE

FIRST ACCEPTANCE CORPORATION, )
)
    Plaintiff, )
)
v. )    No.: 12-0348-IV
)
CATLIN INSURANCE COMPANY (UK), )
LTD., )
)
    Defendant. )

## ALIAS SUMMONS

To the above-named Defendant, CATLIN INSURANCE COMPANY (UK), LTD., c/o Steve Adams, legal counsel, 3340 Peachtree Road, N.E. Suite 2950, Atlanta, Georgia 30326.

You are hereby summoned and required to serve upon Luis C. Bustamante, Plaintiff's attorney, whose address is 900 Gay Street, S.W., P.O. Box 900, Knoxville, Tennessee 37901, an answer to the Complaint herewith served upon you within 30 days after service of this Alias Summons, Complaint upon you, judgment by default can be taken against you for relief demanded in the Complaint.

Issued and tested this _____ day of _____, 2012.

APR 1 8 2012

CRISTI SCOTT
CLERK AND MASTER
SUITE 308
1 PUBLIC SQUARE
Clerk) NASHVILLE, TN 37201

Deputy Clerk

To the Defendant:

Tennessee law provides a four thousand dollar ($4,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution of garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. TCA 26-2-114.

## SERVICE INFORMATION

To the process server: Defendant, CATLIN INSURANCE COMPANY (UK), LTD., c/o Steve Adams, legal counsel, 3340 Peachtree Road, N.E. Suite 2950, Atlanta, Georgia 30326.

### RETURN

I received this alias summons on the _____ day of _____, 2012.

I hereby certify and return that on the _____ day of_____, 2012. I:

( ) served this alias summons and complaint on defendant, in the following manner:
_____
_____
_____
_____
_____

( ) failed to serve this alias summons within 30 days after its issuance because:
_____
_____
_____
_____
_____

_____
Process Server